**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**C&I ENTERTAINMENT, LLC**                                        **PLAINTIFF**

**VERSUS**                                    **CAUSE NO. 1:08CV16-MPM-DAS**

**FIDELITY & DEPOSIT COMPANY
OF MARYLAND**                                                  **DEFENDANT**

**FIDELITY & DEPOSIT COMPANY OF MARYLAND'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

COMES NOW Fidelity & Deposit Company of Maryland ("F&D"), and submits its Memorandum in Support of its Motion for Summary Judgment as follows:

## I. INTRODUCTION

C & I Entertainment, LLC ("C&I") asserted claims against F&D that arise from a bond, bond number PRF 8642169 ("the Bond") issued by F&D naming Ralph McKnight & Son Construction, Inc. ("McKnight") as principal and C&I as obligee in connection with the construction of a theater/skating rink in Kosciusko, Mississippi (the "Project"). C&I's Complaint alleges that F&D breached the Bond and that F&D acted in bad faith. F&D is entitled to summary judgment that it did not breach the Bond, as F&D's obligations under the Bond never arose as a result of C&I's failure to comply with the conditions precedent of the Bond. In addition, McKnight satisfied the judgment rendered against it, making C&I's claim for breach of the Bond moot.

F&D is also entitled to summary judgment on the issue of bad faith. F&D does not owe a duty of good faith and fair dealing to C&I, and thus cannot be liable to C&I for bad faith. Even if F&D owes a duty of good faith and fair dealing to C&I, F&D's actions at all times have been reasonable and evidence its good faith. F&D was entitled to rely on the defenses of its principal, McKnight. Under Mississippi law, F&D had an arguable basis for denying the claim and did not act in bad faith by relying upon McKnight's defenses and allowing McKnight to assert those defenses in a court of law.

## II. FACTS

**A.    The C&I/McKnight Action**

On August 7, 2001, McKnight  entered into a contract with C&I for the construction of a theater/skating rink located in Kosciusko, Mississippi (the "Project").  McKnight was required by C&I to obtain performance and payment bonds and sought to obtain these bonds from F&D.  F&D issued the Bond naming McKnight as principal and C&I as obligee, in connection with the construction of the Project.[1]  According to C&I, the Project was completed on or about February 23, 2003.[2]

After completion of the Project, disputes developed between C&I and McKnight regarding the quality of McKnight's work.  C&I withheld final payment, prompting McKnight to file a lawsuit on August 29, 2003 against C&I in the Circuit Court of Attala County, Mississippi (the "State Court Action").  The State Court Action was tried before a jury and the Honorable Judge Loper on March 8-10, 2011, which resulted in a jury verdict against McKnight in the amount of $300,845.67.  The verdict was upheld on appeal on November 13, 2012.  McKnight paid the judgment, in full, and on December 22, 2012, C&I filed a Satisfaction and Release of Judgment in the Circuit Court of Attala County, Mississippi.[3]

**B.    The Bond Claim**

On December 9, 2003, Glenda Burton-Horne, then counsel for C&I, sent a letter to F&D stating that "a negotiation is in progress toward a proposed settlement of damages and lost revenues" and that "if a full settlement does not occur relief <u>may</u> be sought under the bond".[4]  Upon receipt, no action was taken by F&D as the December 9, 2003 letter did not constitute a claim on the Bond nor

---

[1]  <u>See</u> Affidavit of Thomas C. Finley, Exhibit A to F&D's Motion. A copy of the Bond is attached as Exhibit 1 to Mr. Finley's Affidavit.

[2]  <u>See</u> infra note 4 ("The completion of the building date is deemed to be on or about February 23, 2003. . .").

[3]  A true and correct copy of the Satisfaction and Release of Judgment is attached to F&D's Motion as Exhibit B.

[4]  Emphasis added.  A true and correct copy of the December 9, 2003 letter is attached to F&D's Motion as Exh. C.

elicit a response from F&D. Five months later on May 24, 2004, Paul Koerber, C&I's new attorney,

sent a letter to F&D and Mr. Joyner, McKnight's insurance agent, stating "[t]he owner, C&I

Entertainment, has declared the contractor's default and has terminated its services. Therefore,

demand is hereby made upon the Surety to comply with the terms and provisions of the performance

bond, including, but not limited to, the limits of said bond."[5]

On June 1, 2004, Robert Dambrino, counsel for McKnight, wrote Mr. Joyner, disputing the

accusations made against McKnight in the May 24, 2004 letter, saying:

> [w]e have been provided a copy of Mr. Paul Koerber's letter dated May 24, 2004, to
> you and the above-captioned surety wherein he falsely states that McKnight has failed
> to perform under his contract with C&I. He further falsely states that previous notice
> as called for under the above captioned bond was given. No notice of any kind has
> been received by McKnight wherein C&I notifies the Surety of any deficiency in
> performance.
>                                   . . . . . . .
> McKnight has been and is an outstanding contractor with a consistent, dependable
> record of timely performance and excellent workmanship. The simple truth of this
> matter is that C&I owes the final payment under its contract with McKnight and cannot
> or will not pay it. Koerber's letter is an unveiled attempt to harass and intimidate
> McKnight into relenting in its attempt to collect monies due it from C&I in a lawsuit
> initiated by McKnight in the Circuit Court of Attala County, Mississippi. McKnight
> has filed a lien against the subject property, and has brought suit to enforce the lien in
> the aforesaid Court. It is of singular interest that C&I *has not filed any counterclaim*
> against McKnight in this litigation.[6]

The June 1, 2004 Letter was received by F&D on June 4, 2004.[7] On June 3, 2004, Thomas Finley,

Claims Counsel for F&D, responded to Mr. Koerber's May 24, 2004 letter, stating "[w]e are in the

process of investigating this claim and we have requested that McKnight provide us comments in

response to your default letter dated May 24, 2004."[8] Additionally, the June 3, 2004 letter requested

---

[5] The May 24, 2004 letter is attached as Exhibit 2 to Mr. Finley's Affidavit (Exhibit A).
[6] The June 1, 2004 letter is attached as Exhibit 4 to Mr. Finley's Affidavit (Exhibit A).
[7] See Affidavit of Thomas Finley, at Paragraph 8, Exhibit A.
[8] The June 3, 2004 letter is attached as Exhibit 3 to the Affidavit of Mr. Finley (Exhibit A).

documents from C&I "to assist with [F&D's] investigation" and specifically reserved all rights.[9]  Mr. Finley also spoke to Mr. McKnight on June 4, 2004 regarding the specifics of C&I's claim on the Bond.[10]

F&D heard nothing from C&I in response to its letter for almost three months.[11]  On August 26, 2004, Mr. Koerber wrote Mr. Finley apologizing for the delay in responding and informing Mr. Finley that "most of the information which you requested is unavailable."[12]  Mr. Koerber enclosed approximately thirty pages of documents, consisting of the contract between McKnight and C&I and various correspondences between McKnight and C&I.  On November 5, 2004, Mr. Koerber wrote Mr. Finley concerning the status of the claim, and on November 12, 2004, Mr. Finley responded to the November 5, 2004 letter to inform Mr. Koerber that under Section 3.1 of the Bond, a meeting must occur between the contractor, surety and owner, and suggested that a site visit be planned that could count as the Section 3.1 meeting.[13]

On November 23, 2004, representatives for F&D and C&I inspected the Project.[14]  Subsequent to the inspection, Mr. Finley spoke with David Walker and Courtney Wolffe, F&D's representatives at the inspection, about the specific deficiencies pointed out by C&I at the inspection, which C&I alleged were within McKnight's scope of work.[15]  Mr. Finley also conducted a telephone conference with Mr. McKnight, Mr. Dambrino, Mr. Walker, and Ms. Wolffe regarding the inspection, at which time Mr. McKnight explained that many of the issues pointed out by C&I at the inspection were not

---

[9]  See Exhibit 3 to the Affidavit of Mr. Finley (Exhibit A).
[10]  See Exhibit A at Paragraph 9.
[11]  Id. at Paragraph 10.
[12]  The August 26, 2004 letter is attached as Exhibit 5 to the Affidavit of Mr. Finley (Exhibit A).
[13]  The November 5, 2004 and November 12, 2004 letters are attached as Exhibits 6 and 7 respectively to the Affidavit of Mr. Finley (Exhibit A).
[14]  See Exhibit A at Paragraph 14.
[15]  Id. at Paragraph 15.

within McKnight's scope of work on the Project.[16]   For example, McKnight disputed allegations regarding the electrical work because he maintained that he did not perform any electrical work on the Project, but was instructed to use the existing electrical system.[17]  Mr. McKnight also stated that he had not been paid the remaining contract balances by C&I.[18]

After multiple conversations with McKnight and numerous telephonic requests by F&D for C&I to provide the documentation to support C&I's claim, F&D denied C&I's claim on March 3, 2005.[19]   Since McKnight's dispute with C&I was being pursued in the State Court Action and McKnight's liability had not been adjudicated, F&D's denial referenced only the timeliness of C&I's claim.[20]  On March 28, 2005, Mr. Koerber wrote Mr. Finley regarding the March 3, 2005 denial and asked Mr. Finley to produce, among other things, "specific information, documents and/or witness statements" supporting the determination that McKnight had not worked on the Project for the two years prior to the date of the denial letter.[21]  In an attempt to comply with Mr. Koerber's request, Mr. Finley spoke to Mr. McKnight, and on April 19, 2005  obtained documentation from Mr. McKnight responsive to Mr. Koerber's request.[22]

Recognizing that the documents and information requested in Mr. Koerber's March 28, 2005 letter were generally acquired through the discovery process in litigation, F&D formally retained counsel to respond to Mr. Koerber's March 28, 2005 letter and protect F&D's rights under the Bond. On May 11, 2005, Alberta L. Adams responded to the March 28, 2005 letter.[23]  In  the May 11, 2005

---

[16]  Id. at Paragraph 16.
[17]  Id.
[18]  Id.
[19]  The March 3, 2005 denial letter is attached as Exhibit 8 to Mr. Finley's Affidavit (Exhibit A).
[20]  See Exhibit A at Paragraph 18.
[21]  The March 28, 2005 letter is attached as Exhibit 9 to Mr. Finley's Affidavit (Exhibit A).
[22]  See Exhibit A at Paragraph 20; The Fax Transmittal Sheet and corresponding documentation from Mr. McKnight dated April 19, 2005 is attached as Exhibit 10 to Mr. Finley's Affidavit (Exhibit A).
[23]  Ms. Adams' May 11, 2005 letter is attached as Exhibit 11 to Mr. Finley's Affidavit (Exhibit A).

letter, Ms. Adams enclosed the documentation received from Mr. McKnight on April 19, 2005 and

requested documentation from C&I, much of which F&D had previously requested but had not

received.  After again listing the documents needed from C&I, the letter states:

> F&D first requested much of this information from you on June 3, 2004 but, to date, that information has not been provided.  C&I Entertainment cannot reasonably expect F&D to investigate alleged deficiency claims without being provided complete contract documents, including the final approved plans and complete specifications, and a list of alleged deficiencies.
>
> Further, it is F&D's understanding that C&I Entertainment is holding substantial contract balances.  I call your attention to Section 3.3 of the Bond, which requires that the owner agree to pay the balance of the contract price to the surety to trigger any obligation of the surety under the Bond.  It is my understanding that no such agreement has been made by C&I Entertainment.  F&D further reserves all defenses arising out of any payment by C&I Entertainment for allegedly defective work.
>
> . . . . . . .
>
> Lastly, F&D reserves all of its rights under the Bond and applicable law, including its right to mitigate any loss by having McKnight address any alleged warranty or defective work list compiled by C&I Entertainment.  *See, e.g., St. Paul Fire and Marine Insurance Company v. City of Green River*, 93 F.Supp. 2d 1170 (D. Wyo. 2000).  F&D further reserves all claims and defenses of McKnight.[24]

C&I never responded to Ms. Adams' May 11, 2005 letter, and surprisingly, Ms. Ivester testified at her

deposition that she had never seen the letter before.[25]  At no time has F&D ever revoked its full

reservation of rights contained in the June 3, 2004 or May 11, 2005 letters.[26]

### III. ARGUMENT

**A.      The Summary Judgment Standard**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate

when the pleadings and other evidence show that there are no genuine issues of material fact and that

---

[24]  See Exhibit 11 to Mr. Finley's Affidavit (Exhibit A).
[25]  See pgs. 90-92 of the Deposition of Emma Ivester. Relevant pages of the transcript are attached to F&D's Motion as Exhibit D.
[26]  See Exhibit A at Paragraph 23.

the moving party is entitled to judgment as a matter of law.[27]   Once the moving party supports its

motion with affidavits or other evidence sufficient to show the absence of a genuine issue of material

fact, the "opponent must do more than simply show that there is some metaphysical doubt as to the

material facts."[28]   "[C]onclusory allegations, unsubstantiated assertions, or 'only a scintilla of

evidence'" are insufficient to defeat summary judgment.[29]

Where the record, taken as a whole, could not lead a rational trier of fact to find for the

nonmoving party, there is no "genuine issue for trial" mandating the entry of summary judgment.[30]

The substantive law determines the materiality of facts, and only facts that might affect the outcome

of the suit under the governing law will properly preclude the entry of summary judgment.[31]   There

are no genuine issues of material fact pertaining to the issues raised in this motion.

**B.**      **F&D is Entitled to Summary Judgment on Count I of the Complaint**.

In Count I of the Complaint and in the corresponding prayer for relief, C&I requests a judgment

in the amount of the damages caused by F&D's alleged breach of the Bond.  F&D is entitled to

judgment as a matter of law on Count I as F&D's obligations to C&I never arose under the Bond.

Even if the Court holds that F&D's obligations under the Bond arose, F&D's liability under the Bond

is determined by and is secondary to McKnight's liability, and F&D is entitled to rely on the defenses

of McKnight.   Lastly, to the extent C&I seeks recovery for damages arising out of McKnight's work

---

[27]  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Banc One Capital Partners Corp. v. Kneipper, 67 F.3d 1187,
1198 (5th Cir. 1995).
[28]  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  A party opposing summary
judgment may not rest on mere allegations or denials in the pleadings, and the party's response, via affidavits or
other competent evidence, must set forth specific facts showing that there is a genuine issue for trial.  FED. R. CIV. P.
56(e); Anderson v. Liberty Lobby, Inc., 477 U .S. 242, 256 (1986); Celotex, 477 U.S. at 322.
[29]  Turner v. Baylor Richardson Med. Ctr., 476 F.3d 337, 343 (5th Cir. 2007) (quoting Little v. Liquid Air Corp., 37
F.3d 1069, 1075 (5th Cir. 1994)).
[30]  Matsushita, 475 U.S. at 588.
[31]  Anderson, 477 U.S. at 248.

on the Project, any judgment in this regard would amount to double recovery by C&I and is barred by Mississippi law.

### 1. F&D did not, as a Matter of Law, Breach the Bond.

C&I's allegations that F&D materially breached the terms of the Bond amount to a legal impossibility as F&D's obligations under the Bond never arose due to C&I's disregard for the conditions precedent contained in the Bond. The Bond clearly states that F&D's obligations under the Bond only arise after C&I fulfills all of the conditions precedent of Paragraph 3. C&I admits that it did not follow these conditions precedent. Therefore, F&D is not liable under the Bond.

Mississippi courts have long held that "courts are obligated to enforce a contract that is executed by legally competent parties containing clear and unambiguous terms, and parties are bound by its provisions."[32] Furthermore, Mississippi courts have held that a failure to comply with conditions precedent in a contract renders the contract unenforceable against the enforcing party.[33] In its 2008 Opinion on F&D's Motion for Summary Judgment on the statute of limitations issue, this Court recognized that F&D's obligations under the Bond do not arise until the Paragraph 3 conditions are fulfilled. This Court opined:

> While Fidelity argues they could have been sued in December 2002, **it appears the conditions precedent to liability had not been met at that time. The contract allows for an obligation to be imposed on Fidelity only after a number of conditions have been met.** One of those conditions is that C&I notify both McKnight

---

[32] Furniture & Accessory Retail Group, Inc. v. Lane Furniture Indus., 2011 U.S. Dist. LEXIS 61133 (N.D. Miss. June 8, 2011; see also Ivison v. Ivison, 762 So. 2d 329, 335 (Miss. 2000).

[33] See Austin v. Carpenter, 3 So. 3d 147 (Miss. Ct. App. 2009); Donahoo v. State Farm Mut. Auto. Ins. Co., 684 F. Supp. 911, 913 (N.D. Miss. 1987) (recognizing that the Mississippi Supreme Court repeatedly has held that conditions precedent to recovery under an insurance contract, such as written proof of loss requirements, are enforceable. Coahoma County Bank & Trust Co. v. Feinberg, 241 Miss. 381, 128 So.2d 562, 566 (Miss. 1961) (citing Travelers' Indem. Co. v. Holiman, 174 Miss. 220, 164 So. 36 (1935); Southern States Fire Ins. Co. v. Hand-Jordan Co., 112 Miss. 565, 73 So. 578 (1917)).

and Fidelity that it is considering declaring default and then attempts to arrange a conference to clear up any problems.[34]

This Court's acknowledgment of the conditions precedent in the Bond is consistent with national jurisprudence. Courts around the nation have examined the exact bond language contained in the Bond and have uniformly held that a surety's obligations under the bond do not arise unless and until the obligee complies with *all* of the conditions precedent set forth in Paragraph 3.[35] It is undisputed that the conditions contained in Paragraph 3 of the Bond were not met. Therefore, under this Court's previous ruling, F&D's obligations under the Bond have not been triggered.

### a. C&I did not comply with Paragraph 3.1.

Paragraph 3.1 of the Bond requires C&I to notify F&D that it is considering declaring a default, and then to arrange a meeting between C&I, McKnight and F&D to discuss the methods of performing the contract. Neither of these conditions occurred.

Ms. Burton-Horne's letter of December 9, 2003 does not state that C&I is considering declaring a default, but instead states that the parties are working towards a resolution of issues and

---

[34] C & I Entm't, LLC v. Fid. & Deposit Co. of Md., 2008 U.S. Dist. LEXIS 89905 (N.D. Miss. Oct. 28, 2008).

[35] See Bank of Brewton, Inc. v. International Fidelity Insurance Company, 827 So. 2d 747, 754 (Ala. 2002); Enterprise Capital, Inc. v. San-Gra Corp., 284 F. Supp. 2d 166, 179-181 (D. Mass. 2003)(granting summary judgment to surety, noting that "other courts have consistently interpreted the language in [Paragraph 3 of] this Performance Bond—'the Surety's obligation under this Bond shall arise after ...'—to indicate the listing of conditions precedent."); Mid-State Sur. Corp. v. Thrasher Eng'g, Inc., 575 F. Supp. 2d 731, 741 (S.D. W. Va. 2008)("the provisions of paragraph 3 create conditions precedent which must be satisfied by the owner, in this case Mid-State, before the surety has any obligation under the Bond."); 120 Greenwich Development Associates, LLC v. Reliance Ins. Co., No. 01 Civ. 8219(PKL), 2004 U.S. Dist. LEXIS 10514, 2004 WL 1277998, *12 (S.D.N.Y. June 4, 2004) (holding that the language of Paragraph 3 "creates unambiguous preconditions for triggering [the surety's] obligations under the Bond"); U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co., 369 F.3d 34, 51 (2nd Cir. 2004) (stating that "Paragraph 3 of the [AIA A312] Bonds contained a number of conditions precedent to the Sureties' obligations under the Bonds."); AgGrow Oils, L.L.C. v. National Union Fire Ins. Co. of Pittsburgh, 276 F. Supp. 2d 999, 1017 (D.N.D. 2003) ("[T]he requirements of paragraph 3 are conditions precedent to the surety's bond performance."), aff'd, 420 F.3d 751 (8th Cir. 2005); North American Specialty Ins. Co. v. Chichester School District, No. Civ.A. 99-2394, 2000 U.S. Dist. LEXIS 10745, 2000 W L 1052055, *16 (E.D.Pa. July 20, 2000)("[T]he paragraph three obligations act as conditions precedent to the paragraph four obligations of the surety.").

that C&I will possibly let F&D know if things are not resolved.[36]  Mr. Koerber's May 24, 2004 letter states that McKnight has been declared in default, not that a default is being considered.[37]  The clearly expressed purpose of Paragraph 3.1 is to notify the surety that a default is being considered and then for all three parties to meet to discuss potential solutions.  F&D was never afforded this opportunity as C&I allowed the project to be substantially completed before making demand on F&D to "complete."  Further, no meeting between all three parties occurred, even though F&D pointed out the requirement for such a meeting.[38]

Because the conditions precedent in Paragraph 3.1 were not met, F&D's obligations under the Bond were not triggered. Therefore, F&D did not breach the Bond and is entitled to judgment as a matter of law.

### b.    C&I did not comply with Paragraph 3.2.

### i.    There was no declaration of default.

In Mississippi and around the nation, courts hold that the absence of a declaration of default by the obligee to the surety, when so required by a performance bond, renders the bond and the surety's obligations thereunder null and void.[39]  In 1994, the Fifth Circuit heard a case originating in

---

[36] See Exhibit C.

[37] See Exhibit 2 to Mr. Finley's Affidavit (Exhibit A).  F&D does not agree or acknowledge that the "declaration of default" in Mr. Koerber's May 24, 2004 letter was proper (see section B.1.b.ii.).  F&D merely points the Court to the fact that the May 24, 2004 letter does not comply with Paragraph 3.1 any more than Ms. Burton-Horne's letter of December 9, 2003.

[38] See Affidavit of Mr. Finley, Exhibit A. See also Exhibit D, pg. 57.  F&D would concede that there is a fact issue as to whether McKnight was or was not invited to the November 23, 2004 meeting. However, this does not change the fact that C&D did not comply with the notice required in Paragraph 3.1, or with the other sections of Paragraph 3.

[39] See L&A Contracting v. Southern Concrete Services, 17 F.3d 106 (5th Cir. 1994); see also Dragon Constr., Inc. v. Parkway Bank & Trust, 287 Ill.App.3d 29 (1st Dist. 1997); Balfour Beatty Constr., Inc. v. Colonial Ornamental Iron Works, Inc., 986 F.Supp. 82 (D.Conn. 1997); School Bd. of Escambia Cty. v. TIG Premier Ins. Co., 110 F.Supp.2d 1351 (N.D. Fla.2000); Bank of Brewton v. International Fidelity Ins. Co., 827 So.2d 747 (Ala. 2002); Elm Haven Constr., L.P. v. Neri Constr., LLC, 376 F.3d 96 (2nd Cir. 2004); Hunt Construction Group, Inc. v. Nat'l Wrecking Corp., 542 F.Supp.2d 87 (2008 D.D.C.).

the Southern District of Mississippi involving a similar issue as is present here. In L&A Contracting v. Southern Concrete Services, the Fifth Circuit vacated the District Court's ruling against the surety, F&D, because the obligee, L&A Contracting ("L&A"), failed to declare the principal in default, a "necessary precondition to F&D's liability under its Bond."[40]

In L&A, L&A sent its concrete supplier, Southern Concrete Services ("Southern"), a letter, with a copy to F&D, stating that Southern had breached its contract with L&A and gave Southern five days to correct its deficiencies.[41] Southern performed satisfactorily for the next several months. However, six months later, L&A sent another letter to Southern and F&D requesting "that the Bonding Company take the necessary steps to fulfill this contract to prevent any further delays and costs to L&A."[42] F&D did not respond to the letter.

L&A thereafter brought suit against Southern and F&D, and after a six-day bench trial, the District Court for the Southern District of Mississippi, applying Florida law, awarded a judgment against Southern and F&D in the amount of $642,269.00 plus post judgment interest.[43] On appeal by F&D, the Fifth Circuit recognized that F&D's liability was governed by the terms of its bond, which imposed liability on F&D for Southern's breach only if two conditions existed.[44] First, Southern must have been in default of its performance obligations under the subcontract, and second, L&A must have declared Southern to be in default.[45] Since L&A did not inform F&D "in clear, direct, and

---

[40] L&A Contracting, 17 F.36 at 111.
[41] Id.
[42] Id.
[43] Id. at 109.
[44] L&A Contracting, 17 F.3d at 109.
[45] Id.

unequivocal language" that Southern was in default, the Fifth Circuit vacated the District Court's ruling, holding that F&D was not liable under the performance bond.[46]

Here, like in <u>L&A</u>, there has never been a declaration of default in "clear, direct, and unequivocal language." On December 9, 2003, then attorney for C&I, Glenda Burton-Horne, sent a letter to F&D stating:

> Please accept this letter as formal notification that a negotiation is in progress toward a proposed settlement of damages and lost revenues that have occurred in these legal matters between the above named companies by and through each of their respective legal counsel. However, if a full settlement does not occur relief may be sought under the bond as issued in this matter by C&I Entertainment. The completion of the building date is deemed to be on or about February 23, 2003, for your reference.[47]

This letter cannot be construed as a declaration of default as there is no "clear, direct, and unequivocal" language declaring a default. Similar to <u>L&A</u>, the word default is not even mentioned. The letter's stated intent is to formally notify F&D "that a negotiation is in progress toward a proposed settlement." This is not sufficient to trigger F&D's obligations under the Bond. Paul Koerber, C&I's subsequent attorney, sent a letter to F&D dated May 24, 2004 that C&I may argue constitutes its declaration of default under the Bond. In the May 24, 2004 letter, Mr. Koerber states, "[t]he owner, C&I Entertainment, has declared the contractor's default and has terminated its services. Therefore, demand is hereby made upon the Surety to comply with the terms and provisions of the performance bond, including, but not limited to, the limits of said bond."[48] While at first blush this letter seems to contain the requisite language to satisfy a proper declaration of default under the Bond, it does not, as the letter was sent one year and three months after the Project was completed. As C&I's counsel stated

---

[46] <u>Id.</u> at 106.
[47] <u>See</u> Exhibit C.
[48] <u>See</u> Exhibit 2 to Mr. Finley's Affidavit (Exhibit A).

in the December 9, 2003 letter, the building was completed on or about February 23, 2003.[49] The L&A

Court spoke precisely to this issue:

> [a] declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond.[50]

While the May 24, 2004 letter states that C&I declared McKnight's default and terminated its services,

a legal default did not occur because C&I admits that it never terminated McKnight's contract and the

Project was complete.

### ii. C&I did not terminate McKnight.

As the L&A Court held, in order to constitute a legal default, the declaration must 1) inform

the surety that the principal has committed a material breach or series of material breaches of the

subcontract, 2) that the obligee regards the subcontract as terminated, and 3) that the surety must

immediately commence performing under the terms of its bond.[51]  In addition to the condition of the

Bond that C&I must declare McKnight in default of its contract before F&D's obligations arise,

Paragraph 3.2 of the Bond echoes the L&A language by specifically requiring C&I to terminate

McKnight's right to complete the Project.

The issue of McKnight's termination was hotly contested during the State Court Action.  Ms.

Ivester, C&I's representative, testified several times that C&I never terminated McKnight's right to

complete its work on the Project.  In fact, when Ms. Ivester was questioned by McKnight's attorney,

she testified that, at all times, she "gave him free will to the building to finish anything he needed to

---

[49] See Exhibit C.
[50] L&A Contracting, 17 F.3d at 109.
[51] Id.

finish."[52]   Additionally, when questioned by her own attorney as to whether or not she ever told Mr.

McKnight he could not come back on the property to do work, she stated that she never told him that.

The Trial Transcript reads:

> Q.    Have you ever told Mr. McKnight that he could not come back to your property to do work?
> A.    Not personally, no.
> Q.    After the litigation, your prior lawyers in this case wrote him a letter?
> A.    Yes.  February 2004, after the last attempt on the roof they did in February of 2004.
> Q.    But you, personally, have never told Tommy [McKnight] not to come on the property.
> A.    No, no.  **I would never tell him he couldn't come back on the property.** Bryan [McKnight] told us the day that he handed us the keys, they always maintain a key to the customer's building.[53]
>
>                    * * * *
>
> Q.    With all the problems that you have discussed with Mr. McKnight and his company through the course of this process, why didn't you just, at some point, fire Mr. McKnight?
> A.    Early on, even the day that my husband had an improper conversation on the telephone with him, he was very unhappy, wanting to fire him.  First of all, he had drawn so much money, probably – this was August of '02 that he had drawn approximately 300 and something thousand dollars of his money based on stored material, which was okay because the materials had been taken – brought to the site.  When you looked at the amount of our bank loan, even with the excess I had for extra things I wanted to do to the theater, there was not a – when you move from one contractor to the other, it just costs a lot of money and there was not enough money to move to finish the project and especially in a timely manner.  I told Reid that I would handle the construction, the rest of it, with the McKnights, myself.[54]

Ms. Ivester again testified to this fact on McKnight's cross examination when counsel for Mr.

McKnight asked Ms. Ivester:

---

[52]  See Testimony of Emma Ivester in the State Court Action, pages 39-40.  Relevant pages of the Trial Transcript are attached to F&D's Motion as Exhibit E.
[53]  See Exhibit E, at page 460
[54]  Id. at pages 467-468.

Q.      The issue with the last day that McKnight was on the project, it has been testified to. We have heard many times April of 2003. You heard McKnight say you informed him at that time, "Don't come back."

A.      That was not a true statement. He come in 2004 to attempt to repair the roof.

\* \* \* \*

Q.      Okay. The last day that you know they [McKnight] were out there on a warranty item was April of '03; was it not?

A.      Yes. Mr. McKnight said that I told him not to come back on the property. **That is not a true statement.** He told me he would not come back unless I paid him his retainage. Okay. And until my warranty was up, Mr. McKnight retained a key to that building. There was never anything said about him not coming back on the property in February of '04.[55]

As Ms. Ivester's testimony at trial clearly shows, C&I did not terminate McKnight's right to complete the project. Since C&I did not terminate McKnight's right to complete the Project, C&I did not comply with Paragraph 3.2 of the Bond, a precondition to F&D's liability. Under clear national jurisprudence and this Court's prior ruling, F&D is not liable for breach of contract as C&I alleges because its obligations under the Bond did not arise.

### c.      C&I did not comply with Paragraph 3.3.

C&I also failed to pay the balance of the contract price to F&D, as required by Paragraph 3.3 of the Bond. In the May 11, 2005 letter from F&D's counsel to counsel for C&I, Ms. Adams points C&I to the condition precedent contained in Paragraph 3.3:

> Further, it is F&D's understanding that C&I Entertainment is holding substantial contract balances. I call your attention to Section 3.3 of the Bond, which requires that the owner agree to pay the balance of the contract price to the surety to trigger any obligation of the surety under the Bond. It is my understanding that no such agreement has been made by C&I Entertainment. F&D further reserves all defenses arising out of any payment by C&I Entertainment for allegedly defective work.[56]

---

[55] Id. at pages 507-508.
[56] See Exhibit 11 to Mr. Finley's Affidavit (Exhibit A).

Furthermore, the entire reason McKnight initiated the State Court Action against C&I was due to the fact that C&I refused to pay McKnight the remaining contract balance. In fact, at the trial of the State Court Action, C&I admitted that it did not pay McKnight the remaining contract balance[57] and in fact, at no time did C&I offer to pay the remaining contract balances to F&D.[58] Because C&I did not comply with Paragraph 3.3 of the Bond, F&D's obligations under the Bond did not arise. Therefore, F&D did not breach the Bond and is entitled to judgment as a matter of law.

### 2. F&D's Liability to C&I is Governed by McKnight's Liability to C&I, which Liability has been Fully Satisfied by McKnight.

Even if the Court finds that C&I fulfilled the conditions precedent found in Paragraph 3 of the Bond, C&I has no damages since McKnight has fully satisfied its debt to C&I. Mississippi courts have long held that if a principal has no liability, the surety cannot be held liable.[59] In so following, the Fifth Circuit stated: "the general rule of law which governs the liability of sureties upon bonds is that the surety is not liable unless the principal is, and, therefore, may plead any defense available to the principal."[60] Therefore, F&D's liability to C&I under the Bond is governed by McKnight's liability to C&I, which has been extinguished. C&I conceded that F&D could have no liability unless and until McKnight was found liable in its Response to F&D's Motion to Stay.[61] The Bond further evidences F&D's secondary obligation to McKnight's liability. Paragraph 1 states "[t]he Contractor and Surety, jointly and severally bind themselves. . .to the Owner for the performance of the Construction Contract,

---

[57] See Exhibit E, at pages 56 and 459-460.

[58] See Exhibit A at Paragraph 24. See Exhibit D, pgs. 97-98.

[59] See Brazeale v. Lewis, 498 So. 2d 321 (Miss. 1986)("no liability may be imputed to its surety beyond that of its principal."); see also Irving v. Bankers' Mortg. Co., 169 Miss. 890, 896 (Miss. 1934)("The liability of the surety is measured by that of its principal").

[60] National Surety Corp. v. United States, 143 F.2d 831, 835 (5th Cir. 1944); see also Pacific Lining Co., Inc., v. Algernon-Blair Construction Co. v. J.A. Construction Co, 812 F.2d 237, 241 (5th Cir. 1987)("the derivative liability of a surety cannot exist unless the principal is first liable.").

[61] See Document 33, at page 1.

which is incorporated herein by reference."[62]  Since F&D is only secondarily liable for McKnight's

debt, the fact that McKnight has satisfied the debt, in full, bars C&I from recovering from F&D under

the McKnight/C&I contract.

To the extent C&I seeks damages from F&D arising from McKnight's work on the Project,

F&D is entitled to judgment as a matter of law against any such recovery.   It is undisputed that

McKnight was found liable to C&I in the amount of $300,845.67 for its work on the Project.  It is also

undisputed that McKnight fully satisfied its debt to C&I.[63]  If C&I were allowed to recover any damages

from F&D under the Bond, which damages are limited to those for which McKnight is liable, C&I

would receive a double recovery.

Mississippi law states that "in no event" is a party entitled to recovery that would constitute a

windfall or double recovery.[64]  To the extent the damages C&I seeks from F&D in Count I of the

Complaint are the damages resulting from McKnight's defective work on the Project, C&I has already

been paid those damages.  Under longstanding Mississippi law, C&I is not entitled to recover those

same damages again from F&D, and F&D is entitled to judgment as a matter of law against any such

recovery.

**C.     F&D is Entitled to Summary Judgment as to Count II of C&I's Complaint**.

F&D is also entitled to summary judgment on Count II of C&I's Complaint. Count II alleges

that F&D denied C&I's claim in bad faith and that C&I is entitled to punitive damages from F&D.

---

[62]  See Exhibit 1 to Mr. Finley's Affidavit (Exhibit A).
[63]  See Exhibit B.
[64]  See Worldwide Forest Prods., Inc. v. Winston Holding Co., 1999 U.S. Dist. LEXIS 2605 (N.D. Miss. Jan. 18, 1999)(citing  Ciba-Geigy Corp. v. Murphree, 653 So. 2d 857 (Miss. 1994)); see also Pemberton v. State Farm Mut. Auto. Ins. Co., 803 F. Supp. 1187, 1193 (S.D. Miss. 1992)("the injured party should not derive profit nor double recovery from the injury.");  Cook Industries, Inc. v. Carlson, 334 F. Supp. 809, 816 (N.D. Miss. 1971);  Mississippi Power Co. v. Harrison, 247 Miss. 400, 152 So. 2d 892, 903 (Miss. 1963); Gillis v. Sonnier, 187 So.2d 311 (Miss. 1966).

F&D is not liable under Count II of the Complaint for several reasons.

**1.    F&D does not Owe a Duty of Good Faith and Fair Dealing to C&I and Cannot be Liable for Punitive Damages.**

No Mississippi court has directly been faced with the issue of whether or not a surety owes a duty of good faith and fair dealing to its obligee. In fact, the few cases in Mississippi that discuss bad faith as it relates to a construction bond surety treat the surety, without discussion, as an insurance company and apply the insurance bad faith standard.[65]   However, the Mississippi Supreme Court has long held that "**a surety is not liable for punitive damages**."[66] Furthermore, the United States Supreme Court has stated that suretyship is not insurance, and as such, applying the law regarding insurance is incorrect.[67]

While no Mississippi Court has directly considered this paramount issue, Texas, a sister state in the Fifth Circuit, has ruled that a surety does not owe a duty of good faith and fair dealing to its obligee. F&D asks the Court to rule on this issue of first impression and find that a surety does not owe an obligee a duty of good faith and fair dealing. Because of the differences between insurance and suretyship, the absence of Mississippi law recognizing this difference, and the similarities between Texas law and Mississippi law, this Court should rely on and apply the analysis set out by the Texas Supreme Court.

In Great American Insurance Company v. North Austin Municipal Utility District No. 1, the Supreme Court of Texas held that the surety owes no common law duty of good faith and fair dealing

---

[65] See e.g., Sentinel Indus. Contr. Corp. v. Kimmins Indus. Serv. Corp., 743 So. 2d 954 (Miss. 1999).

[66]   U.S. Fidelity & Guaranty Co. v. State. 182 So. 2d 919, 922 (Miss. 1966); see also Vanderslice v. Shoemake, 102 So. 2d 804, 805 (Miss. 1958); see also Puzts v. Carroll, 199 So. 76, 78 (Miss. 1940); see also Cooper v. U.S. Fidelity & Guaranty Co., 188 So. 6, 8 (Miss. 1939) ("sureties are not liable for or in respect to exemplary or punitive damages.").

[67] See Pearlman v. Reliance Ins. Co., 371 U.S. 132, 140 (1962).

to the bond obligee.[68]  In that case, Great American issued bonds naming North Austin Municipal

Utility District No. 1 ("MUD") as obligee and Underground Utilities Company ("Underground") as

principal in connection with a project that required Underground to refurbish and relocate an existing

dry well.[69]  Underground removed the well and shipped it to its subcontractor, Smith Pump Company,

for refurbishment.[70]  The well was delivered and installed, and in December of 1988, MUD accepted

the well as substantially complete.[71]

    In March 1989, the well collapsed and MUD demanded that Underground correct the problem.

On April 4, 1989, MUD sent notice of the defect to Great American, the surety.[72]  On April 26, 1989,

Great American denied the claim, stating that the problem with the well appeared to be a design issue

and not Underground's fault.[73]  MUD subsequently filed suit against Great American, Underground,

and others.  The jury found in favor of MUD, specifically finding that Great American knowingly

committed deceptive acts in violation of Article 21.21 of the Insurance Code and breached a common

law duty of good faith and fair dealing.[74]  The jury awarded punitive damages against Great American.

Great American appealed the decision of the trial court, and the Court of Appeals affirmed.[75]  On further

appeal, Great American argued that the Court of Appeals erred in holding that the contractual

relationship between a surety and its bond obligee creates a common law duty of good faith and fair

dealing.[76]

---

[68] Great American Insurance Company v. North Austin Municipal Utility District No. 1, 908 S.W. 2d 415, 420 (Tex. 1995), rev'd on other grounds, 950 S.W.2d 371 (Tex. 1997).
[69] Id. at 417.
[70] Id.
[71] Id.
[72] Id.
[73] Id.
[74] Id. at 418.
[75] Id.
[76] Id.

The Supreme Court of Texas agreed with Great American, and noted that a duty of good faith and fair dealing does not exist in the context of all contractual relationships.[77] A duty of good faith and fair dealing arises in the context of liability insurer and its insured, however, because of the special relationship between them.[78] Applying the Arnold factors,[79] the Great American Court found that there was no special relationship in the suretyship context and stated that the unequal bargaining power between the insurer and its insured is not present in the suretyship context. One factor that the court examined in making this determination was the fact that the obligee controlled every aspect of the agreement between itself and the principal. Because the surety's liability was secondary to its principal's and was largely determined by the contract between the principal and the obligee, there was no unequal bargaining power warranting the existence of a special relationship.[80]

Just as in Great American, the obligee, C&I, had equal bargaining power in negotiating its contract with McKnight. As such, C&I had complete power, before agreeing to the contract with McKnight, to dispute any terms therein. Because C&I had complete control over the contract at issue, and because F&D's liability is only triggered by and limited to McKnight's liability to C&I, there is no special relationship between F&D and C&I that triggers a duty of good faith and fair dealing.

Secondly, in determining that no special relationship exists between a surety and its obligee, the Great American Court judicially recognized the fundamental differences between a liability insurance contract and a surety bond. A liability insurance contract involves only two parties, the insurer and the

---

[77] English v. Fisher, 660 S.W.2d 521, 522 (Tex. 1983)

[78] Arnold v. National County Mut. Fire Ins. Co., 725 S.W.2d 165, 167 (Tex. 1987).

[79] Arnold, 725 S.W.2d at 167. In Arnold, the court, in finding a special relationship between a liability insurer and its insured, considered the following factors "[1] unequal bargaining power between the insurer and its insured, the nature of the insurance contracts (which permit unscrupulous insurers to take advantage of insureds' misfortunes in negotiating claim resolution), and [2] the insurance company's exclusive control over the claim evaluation process." Mississippi has recognized the Arnold factors as well. See United American Ins. Co. v. Merrill, 978 So. 2d 613, 636-637 (Miss. 2007); See also Andrew Jackson Life Ins. Co. v. Williams, 566 So. 2d 1172, 1189 (Miss. 1990).

[80] Great American Ins. Co., 908 S.W. at 418.

insured.  In contrast, suretyship involves a tripartite relationship between the surety, its principal, and the bond obligee, in which the obligation of the surety is intended to supplement an obligation owed by the principal to the bond obligee.[81]  The <u>Great American</u> Court stated:

> [u]nlike a liability insurance contract, in which the obligation of the insurer to the insured is the primary obligation of indemnity to the insured for loss, the obligation of the surety to a bond obligee is secondary to the obligation owed to its principal.  A party sustaining a loss covered under a liability insurance contract can only look to its insurer for recourse.  A bond obligee has a remedy against its principal.[82]

As discussed above, Mississippi law states that a surety's obligation on a bond is secondary to that of its principal.[83]  Another significant distinction between sureties and insurers pointed out by the Texas Court, which is also true under Mississippi law, is that sureties are traditionally entitled to rely upon all defenses available to its principal.[84]  Because the same factors exist here as in <u>Great American</u>, this Court should find that there is no special relationship between a surety and an obligee that warrants a duty of good faith and fair dealing.

Further similarities between Mississippi law and Texas law merit the Court's adoption of the holding in <u>Great American</u>.  As a basis for its holding, the <u>Great American</u> Court recognized a Texas statute that allows a surety to require an obligee to sue upon a written contract before the surety is liable.[85]  Mississippi has a statute that has very similar language and meaning as the statute in <u>Great American</u>. The statute that the <u>Great American</u> Court discussed provides:

> (a) <u>when a right of action has accrued on a contract for the payment of money or performance of an act, a surety on the contract may require by written notice that the obligee forthwith sue on the contract;</u>

---

[81]  <u>Id.</u>

[82]  <u>Id.</u> at 418-419.

[83]  <u>See</u> supra notes 56 and 57.

[84]  <u>Great American Ins. Co.</u>, 908 S.W. at 419; <u>see also</u> Buie v. Pollock, 2 Miss.Dec. 151, 1881 WL 4592, *3 (Miss. 1881); supra note 57.

[85]  <u>Great American Ins. Co.</u>, 908 S.W. at 419.

(b) A surety who gives notice to an obligee under subsection (a) of this section is discharged from all liability on the contract if the obligee;
(1) is not under a legal disability; and either
(2) fails to sue on the contract during the first term of court after receiving the notice, or during the second term showing good cause for the delay; or
(3) fails to prosecute the suit to judgment and execution.[86]

Mississippi's statute states:

Any person bound as surety or accommodation indorser for another, may, at any time before the debt has become due or liability been incurred, give notice in writing to the creditor to commence and prosecute legal proceedings against the principal debtor, if living and resident within this state, for the recovery of the debt; and if the creditor fails to commence legal proceedings by the next term of the court in which the same shall be instituted, to be held after the expiration of thirty days from the giving of the notice, and to prosecute the same to effect, the surety who shall have given notice shall be discharged from liability.[87]

As is shown above in the emphasized portions, the Texas statute and the Mississippi statute contain very similar language. After citing the statute, the Great American Court stated that, "[i]mposing a common law duty on a surety because it is allegedly in a position to delay paying claims could directly contravene a surety's express statutory right to require an obligee to file suit against the principal, obtain a judgment, and execute on that judgment."[88] The Great American Court held that the surety bond is subject to "the common law of contracts, which is not punitive in nature."[89] Due to the similarity of the statutes in Texas and Mississippi, this Court should follow the guidance of the Great American Court and hold likewise.

In addition to the similarities between Mississippi and Texas statutes regarding the commencement of proceedings by the claimant, Mississippi's Insurance Code is virtually identical to

---

[86] Tex. Bus. & Com. Code § 34.02 (emphasis added).
[87] Miss. Code Ann. § 87-5-1 (2009) (emphasis added).
[88] Great American Ins. Co., 908 S.W. at 419.
[89] Id. at 420; citing State v. Alpha Oil & Gas, Inc., 747 S.W. 2d 378, 379 (Tex. 1988).

the portion of the Texas Insurance Code that the <u>Great American</u> Court held did not apply to sureties. Article 21.21 of the Texas Insurance Code creates a private cause of action for injuries caused by practices declared to be "unfair or deceptive."[90]  Article 21.21 of the Texas Insurance Code states that the action may be maintained against "the person or persons engaging in such acts or practices."[91] Furthermore, Article 21.21 defines "person" as "any individual, corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyds insurer, fraternal benefit society, and any other legal entity engaged in the business of insurance, including agents, brokers, adjusters and life insurance counselors."[92]

Mississippi has an almost identical statute.  Section 83-5-33 of the Mississippi Code, titled "[u]nfair methods of competition and deceptive practices prohibited" states that, "[n]o person shall engage in this state in any. . .unfair method of competition or an unfair or deceptive act or practice in the business of insurance."[93]  Moreover, Section 83-5-31 defines "person" as "any individual, corporation, association, partnership, reciprocal exchange, mutual, interinsurer, Lloyds insurer, fraternal benefit society, and any other legal entity engaged in the business of insurance, including agents, solicitors, brokers, and adjusters."[94]

After a detailed examination of the legislative intent of Article 21.21,[95] the <u>Great American</u> Court held:

> [g]iven the unique character, rights, and obligations of suretyship, and the complexities
> that would result by the imposition of liability under 21.21, we cannot conclude that

---

[90] <u>Id</u>; <u>see also</u> Tex. Ins. Code art. 21.21.
[91] Tex. Ins. Code art. 21.21 § 16.
[92] <u>Id.</u> at § 2.
[93] <u>Miss. Code Ann.</u> § 83-5-33 (2008).
[94] <u>Miss. Code Ann.</u> § 83-5-31 (2008).
[95] For a complete discussion of the legislative intent of Article 21.21, which F&D argues is analogous to the intent of the Mississippi Legislature in codifying Section 83-5-33 of the Mississippi Code, <u>see</u> <u>Great American Ins. Co.</u>, 908 S.W. at 420-424.

> the Legislature intended to include suretyship in the definition of the business of insurance under article 21.21. Absent a clear legislative directive, we conclude that suretyship, as historically understood in the insurance and suretyship fields, does not constitute the business of insurance under article 21.21.[96]

The Great American Court therefore held that a surety could not be held liable under this Article of the Texas Insurance Code. This Court should similarly hold that Section 83 of the Mississippi Code, the Mississippi Insurance Code, does not allow a bad faith claim to be brought against a surety.

In Great American, MUD was the obligee on the bond, just as C&I is in this case. The same principles that the Great American Court examined apply in this case as well. The case at hand involves a tripartite relationship between F&D, McKnight, and C&I and does not involve a special relationship similar to that of an insurer and insured. Furthermore, just as in Great American, F&D's liability is secondary to that of its principal, McKnight.

This Court should follow Great American and hold that the contract between C&I and McKnight was an arm's length transaction creating no special relationship between C&I and McKnight. As the Great American Court stated, "[t]he derivative nature of a surety's liability and its right to rely upon the defenses of its principal compel the conclusion that a surety, like its principal, should be entitled to test the merits of an obligee's claim without the imposition of extracontractual duties to the bond obligee."[97] By agreeing to the previous stay in this matter, counsel for C&I agrees with the rationale set forth by the Great American Court. McKnight was entitled to and did test the merits of its claim in the State Court Action. Once those merits were tested and a judgment was rendered against McKnight, McKnight promptly satisfied the judgment in full.

Therefore, the Court here should follow the guidance of the Texas Supreme Court and the Fifth

---

[96] Great American Ins. Co., 908 S.W. at 424.
[97] Id. at 420.

Circuit, and find that F&D owed no duty of good faith and fair dealing to C&I. Consequently, F&D cannot be liable for the alleged bad faith denial of C&I's claim, and F&D is entitled to judgment as a matter of law on Count II of C&I's Complaint.

### 2. Alternatively, F&D's Denial was not Made in Bad Faith.

If this Court forgoes ruling on the propriety of a bad faith claim against a surety by an obligee, F&D is, nevertheless, entitled to judgment as a matter of law on Count II of C&I's Complaint. Bad faith has been characterized as "conduct which violates standards of decency, fairness or reasonableness."[98] Mississippi has long held that "[i]n order to establish a bad faith claim for punitive damages, a plaintiff must prove (1) defendant lacked an arguable or legitimate basis for denying the claim; and (2) defendant committed a willful or malicious wrong, or acted with gross and reckless disregard of plaintiff's rights."[99] Whether F&D had an arguable basis for denying C&I's claim is an "issue of law for the court."[100]

Interpreting Mississippi law, the United States Court of Appeals for the Fifth Circuit in McQueen Contracting, Inc. v. Fidelity & Deposit of Maryland discussed what constitutes an "arguable or legitimate" basis for denying coverage in the context of surety bonds.[101] There, the court held that a surety who legitimately relies on the principal's substantive defenses to payment cannot be liable in an action for bad faith refusal to pay.[102] In McQueen, a subcontractor made a claim against the general

---

[98] Tarver v. Colonial Life & Acc. Ins. Co., 294 Fed. Appx. 873, 876 (5th Cir. 2008); Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992).

[99] Dedeaux v. State Farm Mut. Auto. Ins. Co., 2013 U.S. Dist. LEXIS 11262, 8-9 (S.D. Miss. Jan. 28, 2013); see also Spansel v. State Farm Fire & Cas. Co., 683 F. Supp. 2d 444, 447 (S.D. Miss. 2010) (citing Un. Am. Ins. Co. v. Merrill, 978 So. 2d 613, 634 (Miss. 2007)).

[100] Peoples Bank of the S. v. BancInsure, Inc., 753 F. Supp. 2d 649, 657 (S.D. Miss. 2010) (citing Broussard v. State Farm Fire and Cas. Co., 523 F.3d 618, 628 (5th Cir. 2008)).

[101] McQueen Contracting, Inc. v. Fid. & Deposit of Md., 871 F.2d 32, 34 (5th Cir. 1989).

[102] Id. at 34-35.

contractor and its payment and performance bond surety for non-payment of labor and materials.[103]

Regarding the payment bond claim, the court reasoned that the surety reasonably refused to pay on the

bond where the principal alleged to have made an offer of tender.[104] At trial, the trial court resolved

a factual dispute as to whether a $150,000 payment from the general contractor to the subcontractor

was a loan or payment on the contract.[105] The trial court found that there was "no credible evidence

that the sum owed was ever unconditionally tendered to [the subcontractor], which is essential for a

tender."[106]

On appeal, the Fifth Circuit reasoned that just because the trial court found that there was no

offer of tender does not mean the surety lacked a "legitimate or arguable" reason to refuse payment.[107]

The court explained, "Clearly, where a factual dispute as to the applicability of a defense exists, it

follows that such defense rests upon an arguable basis."[108] Accordingly, given that Mississippi courts

strictly scrutinize punitive damage awards in insurance litigation, the court refused to hold a surety

liable for bad faith refusal to pay where either the surety or the principal had at least some factual

defense to payment.[109]

Additionally, in Georgia Electric Supply Co. v. United States Fidelity & Guaranty Co., the

Fifth Circuit held that a surety cannot be liable for bad faith where it allowed its principal to fully

investigate a bond claim and completely relied on the principal's investigation.[110] In Georgia Electric,

---

[103] McQueen Contracting v. Fid. & Deposit of Md., 863 F.2d 1216, 1217 (5th Cir. 1989), modified on reh'g, 871 F.2d 32 (1989.) The subcontractor's claim was denied on the performance bond because the court held that the subcontractor could only recover on the payment bond. Id. at 1221-23.

[104] Id. at 34-35.

[105] Id.

[106] Id. at 35.

[107] Id.

[108] Id.

[109] Id.

[110] United States use of Georgia Electric Supply Co. v. United States Fidelity & Guaranty Co., 656 F.2d 993, 997

a general contractor entered into a contract with the United States Postal Service for the construction of a post office in Georgia. Pursuant to Federal law requirements, USF&G supplied a payment bond to the general contractor. Contemporaneous with executing the payment bond, the general contractor executed an indemnity agreement with USF&G, agreeing to hold USF&G harmless against any loss.[111] The general contractor subcontracted the electrical work on the project, and the subcontractor purchased electrical supplies from the plaintiff, Georgia Electric Supply Company ("Georgia Electric").[112] After the project was completed, Georgia Electric made a demand on the contractor for $21,000 that was still owed on its account. The general contractor refused payment.[113] After payment was refused, Georgia Electric brought suit against USF&G on the payment bond. At the trial level, a jury returned a verdict for Georgia Electric for the amount claimed, plus attorneys' fees and prejudgment interest.

On appeal, USF&G argued that the jury erred in awarding Georgia Electric attorneys' fees. In reversing the jury's award, the Fifth Circuit first recognized that in order to recover attorneys' fees under the Miller Act, the surety must have acted in bad faith in denying the claim.[114] The Fifth Circuit then held that relying on its principal's defense, even absent its own investigation, was not bad faith.[115] The Georgia Electric Court agreed with the Eighth Circuit's longstanding law that "[t]he mere finding … that the sureties failed to investigate the claims and relied upon a solvent principal will not, by itself, justify the assessment of vexatious damages where the record demonstrates that the principal presented a reasonable, albeit unsuccessful, defense."[116] In applying the Eighth Circuit's holding, the Georgia

---

(5th Cir. Ga. 1981).
[111] Id.
[112] Id. at 994.
[113] Id. at 995
[114] Id. at 996.
[115] Georgia Electric, 656 F.2d at 996.
[116] Id. (quoting United States ex rel. R. W. Vaught Co. v. F. D. Rich Co., Inc., 439 F.2d 895, 905 (8th Cir. 1971)).

<u>Electric</u> Court stated:

> It was not unreasonable for defendant to leave the investigation and defense of the claim to the general contractor, who was more familiar with the project and who apparently assumed ultimate liability on the claim pursuant to an indemnification agreement. Moreover, the validity of plaintiff's claim was sufficiently in doubt to justify the decision to litigate.[117]

Here, McKnight and C&I clearly had legitimate disputes between them concerning the quality and scope of McKnight's work on the Project, thereby creating an arguable basis for F&D's denial. Upon receipt of Mr. Koerber's May 24, 2005 letter, in which demand was made upon F&D, F&D immediately began its investigation by sending Mr. Koerber the June 3, 2004 letter. This letter stated: "[i]t is our understanding that the owner alleges that McKnight has not fulfilled the terms of his contract. We are in the process of investigating this claim and we have requested that McKnight provide us with comments in response to your default letter dated May 24, 2004."[118] Further, the letter requested that C&I provide F&D with documents in support of its claim and reserved all rights and defenses.[119]

After receipt of a copy of the May 24, 2004 letter from Mr. Koerber, counsel for McKnight wrote Mr. Joyner, the bond agent for McKnight, on June 1, 2004, disputing C&I's entire claim on the Bond.[120] This letter was faxed to F&D by Mr. McKnight on or about June 4, 2004. The June 1, 2004 letter, quoted previously, fully disputes the claim made by C&I. This letter prompted numerous discussions between F&D and McKnight regarding C&I's claim.[121] It was not until almost three months later, on August 26, 2004, when Mr Koerber responded to F&D's June 4, 2004 letter and

---

[117] <u>Id.</u> at 997.
[118] <u>See</u> Exhibit 3 to Mr. Finley's Affidavit (Exhibit A).
[119] <u>Id.</u>
[120] <u>See</u> Exhibit 4 to Mr. Finley's Affidavit (Exhibit A).
[121] <u>See</u> Exhibit A, at Paragraph 9.

provided F&D a few of the requested documents.[122]

Of paramount importance to F&D's investigation was McKnight's defenses to C&I's claim. McKnight's June 1, 2004 letter denies the merits of C&I's claim and questions whether or not the Bond had been implicated. After speaking with McKnight on several occasions before and after the November 23, 2004 inspection, and by examining the pleadings in the State Court Action, it was very apparent that McKnight and C&I had a legitimate dispute as to the quality and scope of McKnight's work on the Project. F&D was entitled to and did, in fact, rely on McKnight's defenses to C&I's claim. Thus, under Mississippi law and the McQueen and Georgia Electric rationale, F&D is not liable for bad faith since it had an arguable and legitimate basis for denying the claim.

C&I agreed that F&D's liability is contingent upon and limited to McKnight's liability to C&I.[123] C&I admits that McKnight disputed C&I's claim and that F&D adopted and was relying on McKnight's position of non-liability.[124] C&I cannot now claim that it is entitled to damages from F&D simply because F&D's denial only mentioned the statute of limitations as its basis for denial. F&D's denial spoke only to the statute of limitations because it was a surety specific issue separate and apart from F&D's reliance on McKnight's defenses. At no time did F&D revoke its right to rely on McKnight's defenses. On the contrary, in the March 30, 2009 Agreed Order on F&D's Motion to Stay, F&D and C&I agreed to the fact that F&D adopted McKnight's defenses and its position that it was not liable to C&I.

As in McQueen and Georgia Electric, because F&D at all times relied on the defenses of McKnight, and because these defenses presented a legitimate and arguable basis for denying C&I's

---

[122] See Exhibit 5 to Mr. Finley's Affidavit (Exhibit A).
[123] See supra, note 58.
[124] See Agreed Order, Document 37, at n. 1; see also Exhibit 3 to Mr. Finley's Affidavit (Exhibit A).

claim on the Bond, F&D is not liable for bad faith in refusing to pay C&I's claim on the Bond. F&D is, therefore, entitled to judgment as a matter of law as to Count II of C&I's complaint.

## C.    C&I is not Entitled to an Award of Attorneys' Fees.

In its prayer for relief, C&I asks the Court for an award of its attorneys' fees and expenses "in having to pursue this action and any other action that may have arisen or may arise as the result of the Defendant [sic] denial of Plaintiff's claim." In its responses to F&D's Interrogatories, C&I stated that it seeks "as actual damages, its attorney's fees incurred in an effort to compel the contractor, McKnight, to perform its obligations under the Construction Contract."[125] More specifically, C&I states that it is entitled to an award of at least $239,999.59, which accounts for the "[a]ttorney's fees and costs. . .prior to and after the filing of the Complaint by McKnight and the Counter-Complaint by C&I."[126] Under no factual or legal circumstance is F&D responsible for the fees C&I incurred because of the lawsuit McKnight brought against it or the counterclaim C&I brought against McKnight. Mississippi law states "attorney's fees are only awarded under Mississippi law when provided for by contract or statute."[127] F&D was not a party to the McKnight/C&I contract and is not liable for attorneys' fees resulting from the defense of McKnight's claim against C&I or C&I's claim against McKnight. F&D is therefore entitled to judgment as a matter of law as to these attorneys' fees.

Likewise, F&D is entitled to judgment as a matter to law as to all attorneys' fees incurred in this action. As stated above, in order for C&I to prevail on its claim for attorneys' fees, there must be a contractual provision or statute allowing for such a recovery. C&I argues that the Bond requires

---

[125] See C&I's verified responses to F&D's First Set of Interrogatories, at No. 18, a true and correct copy of which is attached to F&D's Motion as Exhibit F.

[126] Id. at No. 18, subsection 1.

[127] Asbury MS Gray-Daniels, L.L.C. v. Daniels, 812 F. Supp. 2d 771, 784 (S.D. Miss. 2011) (citing Huggins v. Wright, 774 So. 2d 408, 412 (Miss. 2000) (citation omitted)).

F&D to pay its attorneys' fees it has incurred to date.[128]  This is not the case. C&I relies on Paragraph 6.2 of the Bond in its argument that F&D is liable for its attorneys' fees.  Paragraph 6 of the Bond states:

> 6.  After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, or 4.3 above, then the  responsibilities of the Surety to the Owner shall not be greater than those of the Owner under the Construction Contract.  To the limit of the amount of this Bond, but subject to the commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated with duplication for:
>
> 6.1    The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;
>
> 6.2    Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4; and
>
> 6.3    Liquidated damages, or if no liquidated damages are specified in the Contract, actual damages caused by the delayed performance or non-performance of the Contractor.[129]

F&D is not liable under Paragraph 6 of the Bond because the conditions precedent to the enforcement of Paragraph 6's remedies have not been fulfilled.  The first sentence of Paragraph 6 of the Bond conditions its applicability on the termination of McKnight's ability to complete the Project.  As discussed above, C&I testified that it never terminated McKnight's ability to complete the Project.  Therefore, the potential remedies in Paragraph 6 have not been triggered.

Moreover, the last sentence of Paragraph 6 contains another condition to enforceability that has not been met.  The paragraph reads "[t]o the limit of the amount of this Bond, **but subject to the commitment by the Owner of the Balance of the Contract Price** to mitigation of costs and damages on the Construction Contract. . ."  The entire reason McKnight initiated the State Court Action was due to the fact that C&I did not pay McKnight the remaining contract balance.  The June 1, 2004 letter

---

[128]  See Exhibit F, at No. 16.
[129]  See Exhibit 1 to Mr. Finley's Affidavit (Exhibit A).

from McKnight's counsel states this fact,[130] the May 11, 2005 letter alerted C&I to this precondition,[131] and C&I testified at trial that it did not pay McKnight the remaining contract balance.[132]  Furthermore, at no time did C&I ever offer to pay F&D the remaining contract balance, a precondition under Paragraphs 3 and 6.[133]  Since C&I has never paid nor offered to pay F&D the remaining contract balance, it is not entitled to any recovery under Paragraph 6 of the Bond.

Lastly, subsection 6.2 of the Bond, which C&I purports allows it to recover its attorneys' fees, has not been triggered.  Paragraph 6.2 gives C&I the right to collect "additional legal, design professional and delay costs resulting from the Contractor's Default, **and** resulting from the actions or failure to act of the Surety under Paragraph 4."  Thus, in order for C&I to have an arguable basis to collect any attorneys' fees, Paragraph 4 must have been triggered.  Paragraph 4 begins with the sentence "[w]hen the Owner has satisfied the conditions of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions:"[134]  As explained in detail above, the conditions precedent contained in Paragraph 3 were not satisfied by C&I.  Therefore, Paragraph 4 was not implicated, which implication is a condition precedent to the remedies available under Paragraph 6.2.  Since Paragraph 6.2 is not enforceable, F&D is entitled to judgment as a matter of law absolving it from liability to C&I for its attorneys' fees and expenses and any other relief sought in Paragraph 4 of C&I's prayer for relief.

---

[130]  See Exhibit 4 to Mr. Finley's Affidavit (Exhibit A).
[131]  See Exhibit 11 to Mr. Finley's Affidavit (Exhibit A).
[132]  See Exhibit E, at page 56 and 459-460.
[133]  See Exhibit A, at Paragraph 24.
[134]  See Exhibit 1 to Mr. Finley's Affidavit (Exhibit A).

## IV. CONCLUSION

F&D is entitled to judgment as a matter of law on Count I because C&I did not fulfill the conditions precedent contained in Paragraph 3 of the Bond, and as a result, F&D's obligations under the Bond did not arise. F&D is entitled to judgment as a matter of law on Count II of the Complaint because it does not owe a duty of good faith and fair dealing to its obligee, C&I. However, even if F&D owed a duty of good faith and fair dealing to C&I, it had a legitimate and arguable basis for denying C&I's claim and did not do so in bad faith. Lastly, C&I is not entitled to an award of attorneys' fees as there is no contractual provision or statute allowing for such a recovery.

THEREFORE, Fidelity & Deposit Company of Maryland requests that this Court grant its Motion for Summary Judgment, and dismiss C&I Entertainment, LLC's Complaint, with prejudice.

This the 20th day November, 2013.

Respectfully submitted,

KREBS, FARLEY & PELLETERI, PLLC

/s/   *Ellie B. Word*
ELLIE B. WORD, Ms. Bar No. 100408
ALEC M. TAYLOR, Ms. Bar No. 102874

188 East Capitol Street, Suite 900
Jackson, Mississippi 39201
Telephone: (601) 968-6710
Facsimile:  (601) 968-6708
eword@kfplaw.com
ataylor@kfplaw.com
ATTORNEYS FOR FIDELITY AND DEPOSIT COMPANY OF MARYLAND

## <u>CERTIFICATE OF SERVICE</u>

I, Ellie B. Word, do hereby certify that a copy of the foregoing Memorandum in Support of the Motion for Summary Judgment has been served via the ECF System, on the following:

> Mr. Todd B. Murrah
> GLASSMAN, EDWARDS, WADE & WYATT, P.C.
> 26 N. Second Street
> Memphis, Tennessee 38103

This the 20th day of November, 2013.

/s/ Ellie B. Word

Ellie B. Word
