**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**C&I ENTERTAINMENT, LLC,**

     Plaintiff,

vs.                                **No. 1:08CV16-MPM-DAS**

**FIDELITY & DEPOSIT COMPANY
OF MARYLAND,**

     Defendant.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff C&I Entertainment, LLC, by and through counsel of record, GLASSMAN, EDWARDS, WYATT, TUTTLE & COX, P.C., and pursuant to the Federal Rules of Civil Procedure, and hereby files the following Response in Opposition to Defendant Fidelity & Deposit Company of Maryland's Motion for Summary Judgment:

**<u>Factual Background</u>**

The instant action involves C&I's Complaint for breach of contract and bad faith for F&D's denial of C&I's claim on a performance bond. (*See generally* Complaint, Docket No. 1.) On August 7, 2001, C&I entered into a contract with Ralph McKnight & Son Construction, Inc. ("McKnight") for the construction of a theater and skating rink. (*Id.*) The construction contract was secured by a performance bond issued by F&D. (*Id.*) Although one letter indicates that the work was complete on or about February 23, 2003, McKnight has confirmed that it performed work as late as April 2003. (McKnight fax to C&I on April 7, 2003, Docket No. 86-6, at 26; McKnight fax to F&D on April 19, 2005, Docket No. 86-11.) Additionally, Emma Ivester,

1

representative for C&I, testified that McKnight had failed to perform some of the required work. (*See, e.g.*, Ivester Dep. at 36-37, 47-55, *attached as Exhibit A*.)  Based on deficiencies in McKnight's work, C&I withheld the 5% retainage fee from McKnight.  (Koerber letter to F&D on August 26, 2004, Docket No. 86-6, at 2.)  The construction contract specifically authorized Plaintiff to withhold the retainage in the event of non-conforming work.  (Construction Contract, Docket No. 86-6 at 6, § 5.6-5.7.)  McKnight initiated a lawsuit on August 9, 2003, against C&I to recover the retainage.  (*See* McKnight's Complaint, *attached as Exhibit B*.)  C&I filed a counter-claim on January 9, 2004 and a jury ultimately returned a verdict for the Counter-Plaintiff C&I and against McKnight in the amount of $300,845.67.

When issues as to the completion and quality of McKnight's work first arose, C&I initiated the steps necessary to make a claim on the performance bond.  C&I continually notified McKnight of deficiencies in its work.  In July 2002, Ms. Ivester's husband informed McKnight's representative, "If I have to . . ., I'll go to your bonding company and get this done right." (Ivester Dep. at 33:9-22.)  Ms. Ivester also corresponded with McKnight about its deficient work on October 21, 2002; January 2, 2003; February 21, 2003; February 24, 2003; February 26, 2003; and April 7, 2003.  (Ivester letters to McKnight, Docket No. 86-6, at 18-27.)  Furthermore, on June 16, 2003, Ms. Ivester sent F&D a letter about McKnight's deficient work.  (Ivester letter to F&D on June 16, 2003, *attached as Exhibit C*; Ivester Dep. at 11:20—15:25 (discussing letter and testifying that she sent it to F&D).)  In her deposition, Ms. Ivester testified that the purpose of this letter was to "put [F&D] on notice" of the issues between C&I and McKnight.  (Ivester Dep. at 13:16-19.)

On December 9, 2003, counsel for C&I sent "formal notification" to F&D that C&I was considering declaring a default against McKnight.  (Burton-Horne letter to F&D on December 9,

2003, Docket No. 86-14.)  This notification alerted F&D to the fact that there were questions of McKnight's "defective workmanship" that resulted in potential "damages and lost revenues . . . ." to C&I.  (*Id.*)  Thomas Finley, claims counsel later assigned to this matter, was not employed with F&D at the time C&I sent this letter.  (Finley Dep. at 82:6—83:15, *attached as Exhibit D*.)  The claims counsel who did receive C&I's letter did not open up a file after receiving it.  (*Id.* at 85:15—86:9; 91:17-24; 92:8-14.)  However, Mr. Finley testified that, had he received C&I's letter, it would have put him on sufficient notice of a dispute between C&I and McKnight as to the quality of work that he would have opened up a claims file.  (*Id.* at 86:25—87:8.)

On January 9, 2004, C&I filed an Answer to McKnight's lawsuit in which it declared McKnight in default of the construction contract.  (*See* C&I's Answer to McKnight's Petition, *attached as Exhibit E*.)  C&I gave notice to F&D of McKnight's default and termination in a May 24, 2004, letter, which stated as follows:

> Previously, notice has been provided to both the Surety and its agent, The Bottrell Agency, that the contractor, Ralph McKnight & Son construction, has failed to perform the construction contract which is the subject of this performance bond.  Indeed, a reasonable time to perform the construction contract and to correct faulty workmanship and other defects in the contractor's performance has been given.  The owner, C&I Entertainment, has declared the contractor's default and has terminated its services.

(Koerber letter to F&D on May 24, 2004, Docket No. 86-3 (emphasis added).)  Counsel for McKnight corroborated the fact that C&I had terminated and declared McKnight in default in a letter McKnight sent to C&I on June 1, 2004.  (McKnight letter to F&D on June 1, 2004, Docket No. 86-5.)  McKnight asserted that C&I had "unilaterally locked McKnight out of the subject property" and "unilaterally declared McKnight in default . . . ."  (*Id.*; *see also* Finley Dep. at 191:12-13 (testifying that McKnight told him that "we were barred from the project").)

3

Additionally, Mr. Finley testified that C&I's letter constituted notice of McKnight's default and termination:

> Q:     That letter gives notice that the owner believes that the contractor is in default; is that correct?
>
> A:     Correct.
>
> Q:     And that letter constitutes notice to F&D of that position that the owner believes that the contractor is in default; is that correct?
>
> A:     Yes. The—the letter indicates that the owner has defaulted and terminated the contractor.

(Finley Dep. at 107:14-24.)

On August 26, 2004, C&I provided documentation supporting its claim on the performance bond. (Koerber letter to F&D on August 26, 2004, Docket No. 86-6.) Included in this documentation was correspondence demonstrating that McKnight had performed work on the property as recently as April 7, 2003. (*Id.* at 26-27.) F&D later inspected C&I's property on November 23, 2004. Ms. Ivester testified that Courtney Wolffe Walker, who appeared as a claims representative on behalf of F&D,[1] stated that "there is defective workmanship here as well as issues not finished in the contract." (Ivester Dep. at 60:7-12.) Similarly, Mr. Finley testified that, based on his conversation with the property inspector and Ms. Walker, he felt there were construction issues that warranted additional investigation. (Finley Dep. at 171:16-21.) Specifically, the property inspector had told Mr. Finley that the construction was "less than commercial quality." (*Id.* at 172:20—172:6.)

Nevertheless, on March 3, 2005, F&D denied Plaintiff's claim on the performance bond as follows:

---

[1] Ms. Walker was filling in for Thomas Finley, the claims counsel assigned to this particular matter.

4

> Section 9 of the performance bond provides a two year statute of limitations. Ralph McKnight & Son Construction Company ceased working on the project more than two years ago. Accordingly, we must respectfully deny C&I Entertainment's claim.

(Finley letter to C&D on March 3, 2005, Docket No. 86-9.) On March 28, 2005, counsel for C&I informed F&D that its "determination that McKnight has not worked on this project for over two (2) years is incorrect." (Koerber letter to F&D on March 28, 2005, Docket No. 86-10.) C&I's counsel requested "all information" supporting F&D's "determination that there exists a two-year statute of limitations governing this matter." (*Id.*) Apparently only after receiving C&I's March 28, 2005, letter did F&D seek confirmation from McKnight that it had performed work on the property in April 2003. (*See* McKnight fax to F&D on April 19, 2005, Docket No. 86-11.) On April 19, 2005, McKnight confirmed that it last performed work on the property on April 24, 2003. (*Id.*)

Mr. Finley testified in his deposition that counsel for McKnight was the first to raise the statute of limitations issue prior to F&D's denial of C&I's claim. (Finley Dep. at 199:4-13.) According to Mr. Finley, McKnight's counsel suggested to him that F&D could deny C&I's claim based on the contractual limitations period and that the contractual limitations period would be enforceable under Mississippi law:

A: But at some point, Dambrino brings up, I think you've got a statute of limitations issue, and we talked about that.

Q: Tell me what y'all talked about.

A: Talked [*sic*] about the statute of limitations wording in the bond. I specifically asked whether he believed that that clause—the wording in that clause would be enforced in Mississippi, and he said to his knowledge, he—he believed it would be.

(*Id.*)  He further testified that he denied the claim because he thought that C&I would no longer be able to bring suit against F&D to enforce compliance with the performance bond.  (*Id.* at 297:19-24; 299: 5-17.)

Mr. Finley later learned that his reason for denying C&I's claim had absolutely no basis in law or fact.  (Finley Dep. at 214:6-18.)

### Law and Argument

F&D's Motion for Summary Judgment asks that this Court grant summary judgment on C&I's breach of contract and bad faith claims.  F&D first contends that the conditions precedent of the performance bond have not been satisfied.  However, the record evidence demonstrates to the contrary.  At a minimum, there are genuine issues of material fact as to whether C&I's conduct triggered F&D's obligations to act on C&I's claim on the performance bond.  F&D further contends that it cannot be liable for bad faith denial of C&I's claim because there was an arguable basis for denying the claim.  However, there was no arguable basis for denying C&I's claim based on the contractual limitations provision in the performance bond.  Thus, F&D's denial lacked any basis in fact or law.  As further explained below, this Court should deny F&D's Motion for Summary Judgment.

### I.      Standard of Review

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where the burden of production at trial ultimately rests on the non-movant, 'the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case.'"  *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (quoting *Shields v. Twiss*, 389 F.3d 142, 149

(5th Cir. 2004)).  "'An issue is material if its resolution could affect the outcome of the action.'"
*Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)
(quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)).  "An issue is
'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving
party." *Cuadra*, 626 F.3d at 812 (citation omitted).  The Court is not permitted to make
credibility determinations or weigh the evidence.  *Deville v. Marcantel*, 567 F.3d 156, 164 (5th
Cir. 2009) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).
When deciding whether a genuine fact issue exists, "the court must view the facts and the
inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Sierra
Club, Inc.*, 627 F.3d at 138.

**II.     F&D's Motion for Summary Judgment on Count I of the Complaint should be
denied because C&I complied with all conditions precedent to trigger F&D's
liability under the performance bond.**

In Count I of the Complaint, C&I sued F&D for breach of contract.  As a result of F&D's
breach of the performance bond, C&I was forced to incur substantial attorney's fees in
successfully prosecuting its counter-claim in the State Court action against McKnight.  C&I
timely complied with the conditions outlined in Section 3 of the performance bond, and F&D
failed to meet its obligations.  At the very least, there exist material factual disputes that preclude
this Court from granting summary judgment.  As set forth below, F&D's Motion for Summary
Judgment should be denied.

A.  C&I complied with Section 3.1 of the performance bond.

Contrary to F&D's strained interpretation of the facts, C&I complied with the
requirements of Section 3.1.  Section 3.1 requires C&I to notify F&D and McKnight that C&I is
considering declaring default and to request and attempt to arrange for a conference.

7

(Performance Bond, Docket No. 86-2, at § 3.1.)  With respect to the notice requirement, there is no temporal component, and nothing in this Section, or elsewhere, obligates C&I to provide notice at any particular time.  There is no question that C&I satisfied this requirement when its lawyer sent the December 9, 2003, letter, which stated that it was "formal notification" that a dispute existed between C&I and McKnight and that C&I may seek relief under the performance bond if the dispute could not be resolved.  (Burton-Horne letter to F&D on December 9, 2003, Docket No. 86-14.)  F&D elected not to respond to this letter or to even open a claims file, despite the obvious import of the formal notification.  (Finley Dep. at 85:15—85:9; 91:17-24; 92:8-14.)  According to F&D's reasoning in support of its Motion, the performance bond requires C&I to quote the language of the performance bond exactly—*i.e.,* to use the phrase "considering default"—and provide detailed citations to the paragraphs pursuant to which the notice is given.  However, this obligation is not imposed from the plain language of the bond, nor is this strict construction against the obligee, C&I, favored under Mississippi law.

As noted by F&D in its supporting memorandum, there is generally a nationwide body of law when it comes to construction of standard form performance bonds such as the American Institute of Architect's ("AIA") form A312 bond at issue in this case.  A bond is a contract and thus is subject to the general rules of contract interpretation and construction.  *L. Schreiber & Sons Co. v. Miller Supply Co.*, 77 W. Va. 236, 87 S.E. 353, 355 (1915); *see also Brent v. National Bank of Commerce of Columbus*, 258 So.2d 430 (Miss. 1972).  However, "as a bond executed by a surety for compensation is usually expressed in terms prescribed by the surety, it will for that reason be strictly construed in favor of the obligee."  *City of Mullens v. Davidson*, 57 S.E.2d 1, 7 (1949); *see also Manufacturers & Merchants Bldg. & Loan Ass'n v. Willey,* 321 Pa. 340, 344 (Pa. 1936) (holding that the bond is to be strictly construed in favor of the obligee);

*Garco Indus. Equip. Co., Inc. v. Mallory*, 485 N.E.2d 652, 654 (Ind. Ct. App. 1985) (stating that
"the contract of a surety for hire is viewed as analogous to an insurance contract, and is
construed most strictly against the surety and in favor of the person to be protected"); *BMD
Contrs., Inc v. Fid. & Deposit Co. of Md.*, 679 F.3d 643, 653 (7th Cir. 2012) (same). This is so
because a surety is regarded in law as an insurer. *Elkins Manor Assocs. v. Eleanor Concrete
Works, Inc*., 396 S.E.2d 463, 470 (1990); *see also Mid-State Sur. Corp. v. Thrasher Eng'g, Inc.*,
575 F. Supp. 2d 731, 740-741 (S.D. W.Va. 2008). Under established Mississippi law, insurance
contracts are liberally construed in favor of the insured and strictly construed against the insurer.
*Burton v. Choctaw County*, 730 So. 2d 1, 8 (Miss. 1999) ("[O]ur jurisprudence requires that the
language in insurance contracts, especially exclusionary clauses, be construed strongly against
the drafter."); *State Farm Mut. Auto. Ins. Co. v. Scitzs*, 394 So. 2d 1371, 1373 (Miss. 1981);
*Cruse v. Aetna Life Ins. Co.*, 369 So. 2d 762, 764 (Miss. 1979); *see also Royer Homes of Miss.,
Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 752 (Miss. 2003) (setting out a three-tiered
approach to general contract interpretation); *Miss. Farm Bureau Mut. Ins. Co. v. James Donald
Jones*, 754 So. 2d 1203, 1204-05 (Miss. 2000).

 C&I's December 9, 2003, letter may not quote the precise language of the performance
bond, but it certainly is reasonable to interpret the letter as placing F&D on notice that a claim on
the bond may be pursued if the dispute with McKnight was not resolved. (Burton-Horne letter to
F&D on December 9, 2003, Docket No. 86-14.) Implicit in this is that C&I is considering a
default. (*See id.*) Strictly construing the language against F&D, and drawing all factual
inferences in favor of C&I, as this Court is bound to do in ruling on this Motion, there is, at a
minimum, a disputed issue of fact as to whether C&I complied with Section 3.1. Mr. Finley
testified that the December 9 letter would have put him on notice that C&I had serious issues

with McKnight's work and that it was considering making a claim. (Finley Depo. at 86:25—87:8.) Reasonable minds could easily find that C&I's December 9, 2003, letter was compliant with the first obligation of Section 3.1 that F&D be notified of a possible declaration of default.

Section 3.1 also requires C&I to attempt to arrange a meeting with all three parties to the bond. (Performance Bond, Docket No. 86-2, at § 3.1.) With respect to the meeting contemplated by Section 3.1, F&D concedes there is a factual dispute regarding this issue. (F&D's Memorandum, Docket No. 87, at 10 n.38.) Indeed, it is clear that C&I attempted to arrange such a meeting as evinced by the August 26, 2004, letter to F&D. (Koerber letter to F&D on August 26, 2004, Docket No. 86-6, at 2.) In that letter, C&I invited F&D to inspect the property "as soon as possible." (*Id.*). On November 12, 2004, counsel for F&D wrote to C&I's counsel and indicated that the planned meeting would serve as the Section 3.1 meeting. (Finley Depo 154:25—156:17.) It is undisputed that the meeting was held on November 23, 2004, at which F&D was present, although McKnight chose not to attend. Again, the plain language of the performance bond controls. The bond requires only that C&I attempt to arrange a meeting with all three parties. Whether McKnight wanted to participate or not is out of C&I's control. C&I complied with all conditions of Section 3.1, and, at the very least, factual disputes regarding this compliance preclude a grant of summary judgment.

B. C&I complied with Section 3.2 of the performance bond.

C&I also complied with the terms of Section 3.2 regarding declaration of contractor default and termination of contractor. There are at least two instances in which C&I declared a default and terminated services. First, on January 9, 2004, C&I filed its Answer to the lawsuit filed by McKnight in State Court in which it asserted McKnight's default. Specifically, this Answer stated clearly, directly, and unequivocally that McKnight had committed a series of

material breaches by failing to complete the project per the contract terms and by failing to perform in a workmanlike manner. (C&I's Answer to McKnight's Petition, including without limitation ¶¶ 4-6, *attached as Exhibit E*.) The Answer further stated that C&I had suffered significant damages above and beyond the withheld retainage. (*Id.*) By that point, it was clear that a default and termination had occurred. Courts have held that the institution of litigation between an owner and contractor is sufficient to satisfy Section 3.2 of the A312 performance bond. *See, e.g., Mid-State Sur. Corp. v. Thrasher Eng'g, Inc.*, 575 F. Supp. 2d 731, 742-743 (S.D. W.Va. 2008). Secondly, and perhaps most importantly, C&I clearly and unequivocally gave notice of default to F&D in its May 24, 2004, letter to F&D. (Koerber letter to F&D on May 24, 2004, Docket No. 86-3.) This letter specifically states that C&I "has declared the contractor's default and has terminated its services." (*Id.*)

*Mid-State Surety Corp.* is instructive. There, the plaintiff-owner filed an action against the defendant-contractor, alleging breach of a completion agreement. *Id.* at 734-35. In accordance with an arbitrator's award, the court entered judgment in favor of the owner and against the contractor. *Id.* Before the court was the owner's motion for partial summary judgment declaring the defendant-surety liable under a performance bond for the judgment entered against the contractor. *Id.* The surety also sought summary judgment. *Id.* In analyzing whether the owner had met the conditions precedent of Section 3.2 of the A312 bond, the court stated:

> Inasmuch as [owner's] February 8, 2005, letter declares the contractor's default and cites to paragraph 3.2 of the Performance Bond, it was sufficient to terminate [contractor's] right to complete its work on the construction project and to provide [Surety] with notice of [contractor's] default, even though the letter does not also expressly state that [contractor's] rights have been "terminated." It is well settled that forfeiture on technical grounds is not favored and that courts should not apply the doctrine of *strictissimi juris* for the protection of a compensated surety. *Md. Casualty Co. v. Fowler*, 31 F.2d 881, 884 (4th Cir. 1929). To find that [owner]

11

has sacrificed the benefit of a contract intended to insure the completion of the construction project simply because [owner] failed to use the word 'terminate' in its notice would be to find forfeiture on technical grounds. Moreover, even if the declaration of default was not sufficient to terminate [contractor's] right to complete the Completion Contract, [owner's] civil action against [contractor] in federal court, filed January 26, 2005, for breach of that contract and indemnification would be sufficient to terminate those rights.

*Id.* at 734-43.

While the analysis above alone is sufficient to overcome F&D's arguments, there is also an ambiguity in Section 3.2. Unlike in Section 3.1, where notice to the surety is expressly mentioned, there is no requirement in Section 3.2 that C&I notify F&D of the declaration of default and termination at the time the declaration is declared. Rather, Section 3.2 simply requires that the owner declare the contractor in default and terminate its services. If F&D wanted to include a specific method of providing notice to it, as it did in Section 3.1, it could have included said requirement in Section 3.2 as well. Even if the language is construed to require C&I to notify F&D that it has declared a contractor default and terminated services, the Bond does not prescribe a deadline by which such notice must be given to F&D. The Court should not read such a requirement into the contract as F&D urges.

F&D relies on *L&A Contracting v. Southern Concrete Services*, 17 F3d 106 (5th Cir. 1994) in support of its contention that there was an insufficient declaration of default and termination in this case. However, *L&A Contracting v. Southern Concrete Services* is distinguishable from the instant facts. The most notable distinction is the existence of the May 24, 2004, letter in which a clear and unequivocal notice of default and termination was communicated directly to F&D. Other differences are also discussed below.

In *L&A*, the general contractor (L&A) on a major bridge construction project was the obligee and a concrete sub-contractor (Southern) was the principal on a bond issued by F&D.

12

*L&A Contracting*, 17 F.3d at 108. There were numerous issues between the contractor and the concrete subcontractor, and various letters flowed between them regarding the quality of the subcontractor's work. The court explained the critical facts as follows:

> We need not chronicle the ensuing deterioration in business relations between L & A and Southern. It suffices for this opinion to say that Southern failed to provide sufficient concrete to L & A in a timely manner and breached the subcontract in numerous other particulars. L & A repeatedly complained to Southern about its slow delivery rates and the poor quality of the concrete Southern supplied. On May 29, 1987, L & A sent Southern a letter stating that Southern had breached the contract and giving Southern five days to cure the deficiencies in its performance. L & A sent a copy of the letter to F & D. Southern's performance apparently improved after the May 29 letter. In response to a routine inquiry from F & D on August 3, 1987, L & A stated that Southern was performing satisfactorily.

> Southern's improved performance did not last long, and L & A soon resumed its periodic complaints. On January 12, 1988, L & A sent another letter to Southern and F & D in which it requested "that the Bonding Company take the necessary steps to fulfill this contract to prevent any further delays and costs to L & A." F & D did not respond to the letter and took no action. Southern completed its obligations under the subcontract on May 27, 1988. At no time did L & A refuse to accept Southern's performance.

*Id.*

The facts presented in the instant case are distinguishable. First, contrary to the instant case, there was *never* an express declaration of default by the obligee in *L&A*. Rather, the general contractor sued both the concrete subcontractor and the surety after merely sending letters to "prod" the subcontractor into "improved" performance. *Id.* "Letters from general contractors attempting to prod subcontractors into improved performance are inevitably abundant in large construction projects but are not generally thought to constitute declarations of default." *Id.* at 111. In the present case, not only was there a suit and counter-suit between the obligee and the principal, but there was also an express declaration of default and notice of termination. (Koerber letter to F&D on May 24, 2004, Docket No. 86-3). Another difference is that the

subcontractor in *L&A* was allowed to fully complete performance without any rejection of the work by the general contractor. *Id.* at 108. Here, the work was never accepted by C&I, and C&I was eventually successful in recovering damages for the incomplete performance. Finally, it is interesting that in the *L&A* case, F&D made periodic inquiries after it was made aware of quality issues regarding its principal. Here, after suit was filed by McKnight, after C&I filed a counter-claim, and after C&I sent "formal notification" to F&D, F&D never followed up or even opened a claims file.

Aware of the fact that the clear and unequivocal declaration of default and termination renders the present facts utterly distinct from the facts in *L&A*, F&D argues that C&I's May 24, 2004, letter was ineffective to satisfy Section 3.2 because it was sent one year and three months after the project was completed (based on the date of completion represented by C&I's then-counsel, as February 23, 2003). Despite the statement in the December 9, 2003, letter regarding a February 23, 2003, completion date, there is evidence that work was done into late April 2003 and further evidence that certain aspects of the project were never completed. (*See, e.g.,* Ivester Dep. at 36-27, 47-55.) The fact that judgment was rendered in favor of C&I for an amount far in excess of the withheld retainage supports this conclusion. At any rate, F&D fails to explain why the timing of the letter matters at all.

F&D also fails to cite any contract language that requires C&I to provide notice of default to F&D within a specified time. There is no language in the performance bond that proscribes the Section 3.2 notice being given one year and three months from the alleged date of completion. Rather, the bond states that a contractor default cannot be declared prior to the expiration of twenty days following the Section 3.1 notice; it is conspicuously silent as to how long thereafter a declaration of default and notice to the surety can be given. F&D has failed to

14

cite any legal authority whatsoever in support of its position on this issue. It would be surprising if such a case existed in light of the fact that the limitations period in this case would be, at a minimum, three years. *See* Miss. Code. Ann. §§ 15-1-5; 15-1-41; 15-1-49.

F&D also admits there is a factual question as to whether and when C&I terminated McKnight. The fact that McKnight testified it was terminated creates a factual dispute that further renders summary judgment on this issue improper. Mr. Finley also testified that, based on his investigation at the time, (rather than Ms. Ivester's much later trial testimony), McKnight believed it was "locked out" from further work on the project. (Finley Dep. at 259:6—262:18; *see also* McKnight letter to F&D on June 1, 2004, Docket No. 86-5 (stating that C&I locked McKnight out of the property).)

In sum, all of the requirements under Section 3.2 were satisfied, as demonstrated by the record evidence. At a minimum, there are factual questions regarding whether certain actions on the part of C&I met the conditions of the performance bond.

C. C&I complied with Section 3.3 of the performance bond, or, in the alternative, no balance was owed on the construction contract.

The final pre-condition, Section 3.3, requires C&I "to agree to pay the balance of the contract price" to F&D or to a contractor selected to perform the construction contract. (Performance Bond, Docket No. 86-2, at § 3.3.) According to F&D, C&I did not comply with this condition precedent because it never *tendered* the "contract balance." However, it is undisputed that the only "contract balance" withheld was the retainage amount. (Koerber letter to F&D on August 26, 2004, Docket No. 86-6, at 2.) Whether the 5% retainage was even owed is a factual issue that precludes summary judgment. "Balance of the Contract Price" is expressly defined in the performance bond as the "total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made . . . ."

15

(Performance Bond, Docket No. 86-2, at § 12.1.)  Under the construction contract, the retainage is not due until "the Contract has been fully performed by the Contractor" or "upon acceptance of work and before owner occupancy."  (Construction Contract, Docket No. 86-6, at 7 § 6.)  Thus, the obligation to pay the retainage was never triggered.

Even if Section 3.3 of the bond's reference to "balance of the contract price" is broad enough to include the retainage under these circumstances, F&D has failed to cite any evidence that C&I refused "to agree to pay the balance of the contract price."  The express terms of the bond do not call for the actual tender of the contract balance, but rather that C&I agree to pay it.  (Performance Bond, Docket No. 86-2, at § 3.3)  Section 3.3 of the bond states only that C&I "has agreed to pay the Balance of the Contract Price . . . ."  (*Id.*)  There is no requirement that the money actually be paid or that it be paid at any given point in time.  (*See id.*)  If F&D wanted to be more specific regarding tender of payment and the timing of same, it could have drafted such language.  The affidavit of Paul A. Koerber, Esq. makes clear that C&I complied with Section 3.3.  He states that C&I never refused to pay any amounts to F&D pursuant to Paragraph 3.3 of the Bond, nor did C&I ever, prior to F&D's denial of C&I's claim, take the position that it would not agree to pay any outstanding contract balance according to the terms of the performance bond.  (*See* Koerber Aff. at ¶ 10, *attached hereto as Exhibit F*.)  Ms. Ivester testified in her deposition that she told her attorney, Mr. Koerber, that she would pay to F&D any contract balance owed.  (Ivester Dep. at 97:17-24.)  As set forth by Mr. Koerber, C&I and F&D simply failed to come to terms with how to handle the withheld retainage in light of the fact that the amount withheld was so much less than the amount needed to complete the project pursuant to the terms of the underlying construction contract.  (*See* Koerber Aff. at ¶¶ 7-9.)

16

Finally, when C&I ultimately prevailed on its counter-claim against McKnight and McKnight had to pay substantial damages to C&I, it was conclusively established that no balance remained. Thus, there was no contract balance due inasmuch as C&I sought recovery from McKnight of damages in excess of the retainage sought by McKnight and the jury ultimately awarded damages to McKnight in excess of the retainage. Because there was no balance to be paid to F&D on the construction contract at the time of McKnight's breach, it was not possible for C&I to comply with Section 3.3 of the performance bond and it was excused from doing so. This argument was accepted by the court in *Mid-State Sur. Corp. v. Thrasher Eng'g, Inc.*, 575 F. Supp. 2d 731 (S.D. W.Va. 2008); *see also U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 219 F. Supp. 2d 403, 484 (S.D.N.Y. 2002), *reversed on other grounds*, 369 F.3d 34 (2d Cir. 2004) (holding that bond owner was not required to pay surety when there was no remaining contract balance at the time default was declared). This reasoning makes sense in light of the purpose behind Section 3.3, which is to afford the surety some security in satisfying payment to a replacement contractor when the work is incomplete. This situation is not presented when only the retainage is at issue and when the owner has a claim for damages far in excess of the withheld retainage.

In sum, C&I did not have to comply with Section 3.3 because there was no contract balance to pay. Even if there was a contract balance, F&D has failed to meet its burden on summary judgment because it has failed to show that C&I refused to "agree to pay."

III. **This Court should deny F&D's Motion for Summary Judgment as to C&I's bad faith claim because, under Mississippi law, F&D owes a duty of good faith and fair dealing to C&I.**

F&D contends that it cannot be liable for bad faith because it does not owe a duty of good faith and fair dealing to C&I. F&D urges this Court to ignore Mississippi law and prior Fifth

17

Circuit precedent and to adopt the reasoning of a Texas Supreme Court case that drew a distinction between insurance and surety law and declined to hold a surety liable for bad faith. (*See* F&D's Memorandum, Docket No. 87, at 18-24 (citing *Great Am. Ins. Co. v. N. Austin Municipal Utility Dist. No. 1*, 908 S.W.2d 415 (Tex. 1995), *reversed on other grounds*, 950 S.W.2d 371 (Tex. 1997).)  However, *Great American Insurance Company* is neither controlling nor persuasive in the case at bar.

Instead, this Court must apply Mississippi law on bad faith claims.  The Mississippi Supreme Court has held that bad faith claims may be made against a surety.  *Sentinel Indus. Contracting Co. v. Kimmins Indus. Serv. Corp.*, 743 So.2d 954, 972 (Miss. 1999).  Bad faith claims against a surety are treated <u>in the exact same manner</u> as those against an insurance company.  *Id.*  If the Mississippi Supreme Court had desired to draw a distinction between insurance companies and sureties on a Mississippi common law bad faith claim, it could have done so.  In fact, when the Mississippi Supreme Court handed down *Sentinel* in 1999, the Texas Supreme Court had already decided *Great American Insurance Company*.  Whether or not the Mississippi Supreme Court considered the *Great American* decision specifically, it still likely considered a similar argument and chose not to follow its reasoning.  Instead, the Mississippi Supreme Court treated sureties and insurance companies as indistinguishable for the purposes of bad faith.  *Id.*

The Fifth Circuit, when interpreting and applying Mississippi law, has also held that a surety—in fact, F&D itself—is subject to a bad faith claim.  *McQueen Contracting, Inc. v. Fidelity & Deposit Company of Maryland*, 871 F.2d 32, 34 (5th Cir. 1989).  In analyzing the plaintiff's bad faith claim against F&D, the Fifth Circuit applied the same legal standard to which an insurance company is held under Mississippi law.  *Id.*  Because Mississippi law is

controlling on the issue of bad faith, this Court must apply the reasoning of *Sentinel* and *McQueen*. Accordingly, F&D owed a duty to good faith and fair dealing to C&I, and it is subject to liability for bad faith denial of C&I's claim on the performance bond.

Additionally, the reasoning underlying *Great American* is not persuasive. F&D contends that a surety is distinguishable from an insurance company because C&I allegedly had equal bargaining power. (F&D's Memorandum, Docket No. 87, at 20.) However, this allegation is unsupported by the record. In fact, the contract between C&I and McKnight was a standard form contract drafted by the AIA. (*See* Construction Contract, Docket No. 86-6, at 3-10.) The performance bond was also a standard form produced by the AIA. (*See* Performance Bond, Docket No. 86-2.) The use of a standard form construction contract and performance bond indicates C&I's lack of bargaining power.

F&D further contends that a surety is distinguishable from an insurance company because a surety's obligation on a bond arises only after contractor default and because a surety is traditionally entitled to rely on the defenses available to the contractor. (F&D's Memorandum, Docket No. 87, at 21.) However, this is irrelevant to the policies underlying a bad faith claim because C&I's bad faith claim is brought on grounds of F&D's wrongful conduct. C&I's bad faith claim asserts that F&D willfully, maliciously, or with gross negligence or reckless disregard denied C&I's claim on the performance bond despite the fact that there was coverage and no arguable basis for denying the claim. *See Sobley v. Southern Natural Gas Co.*, 210 F.3d 561, 564 (5th Cir. 2000) (discussing Mississippi law). Thus, a bad faith claim, although prompted by the contractor's failure to perform under the contract, is primarily based on the surety's independent tortious act. In explaining why an insurance company could be liable for bad faith denial of a claim, the Mississippi Supreme Court stated as follows:

> If an insurance company could not be subjected to punitive damages, it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impunity. To permit an insurer to deny a legitimate claim, and thus force a claimant to litigate with no fear that claimant's maximum recovery could exceed the policy limits plus interest, would enable the insurer to pressure an insured to a point of desperation enabling the insurer to force an inadequate settlement or avoid payment entirely.

*Eichenseer v. Reserve Life Ins. Co.*, 682 F. Supp. 1355, 1363-64 (N.D. Miss. 1988) *aff'd* 881 F.2d 1355 (5th Cir. 1989), *cert. granted and vacated on other grounds*, 499 U.S. 914 (1991) (quoting *Standard Life Ins. Co. v. Veal*, 354 So.2d 239, 248 (Miss. 1977)). This same rationale applies to F&D's investigation and denial of C&I's claim on the performance bond.

Finally, F&D's contention that a surety is not liable for punitive damages under Mississippi law is misleading and an incorrect statement of the law in the context of a bad faith claim. (*See* F&D's Memorandum, Docket No. 87, at 18.) F&D cites to several old Mississippi decisions in its claim that it cannot be held liable for punitive damages. (*Id.* (citing *U.S. Fidelity & Guar. Co. v. State*, 182 So.2d 919 (Miss. 1966); *Vanderslice v. Shoemake*, 102 So.2d 804 (Miss. 1958); *Ouzts v. Carroll*, 199 So. 76 (Miss. 1940); *Cooper v. U.S. Fidelity & Guar. Co.*, 188 So. 6 (Miss. 1939). On closer inspection, however, these cases stand solely for the proposition that a surety is not liable for punitive damages that have been assessed against the contractor. *See, e.g.*, *U.S. Fidelity & Guar. Co.*, 182 So.2d at 818.

In *U.S. Fidelity & Guaranty Co. v. State*, the plaintiff had filed a wrongful death suit against a sheriff who shot and killed her husband. *Id.* at 814. A jury returned a verdict that potentially included punitive damages. *Id.* The plaintiff then brought suit on the sheriff's bond, and the surety argued that "it is not liable as surety for the amount of the judgment [against the sheriff] which includes punitive damages." *Id.* at 817. The court agreed that the surety was not liable for the portion of the verdict that included punitive damages. *Id.* at 818. Accordingly,

20

these cases state <u>only</u> that a surety is not liable for punitive damages assessed against a contractor. *Id.*; *see also Vanderslice*, 102 So.2d at 526-27 (involving suit against surety based on punitive damages assessed against officer who assaulted plaintiff); *Ouzts*, 199 So. at 223-24 (involving suit on replevin bond after trial concerning wrongful detention); *Cooper*, 188 So. 122-23 at (involving suit against surety after litigation with estate administrator). Thus, this proposition is irrelevant to the instant action. Here, C&I seeks punitive damages, not based on an award of punitive damages assessed against McKnight, but based on F&D's own wrongful conduct.

In sum, under the controlling decisions of the Supreme Court of Mississippi and the Fifth Circuit applying Mississippi law, F&D owed a duty of good faith and fair dealing to C&I and is subject to a bad faith claim under the same standard as an insurance company. *See McQueen Contracting, Inc.*, 871 F.2d at 34; *Sentinel Indus. Contracting Co.*, 743 So.2d at 972.

IV. **This Court should deny F&D's Motion for Summary Judgment because F&D had no arguable basis for denying C&I's claim on the performance bond.**

F&D contends that summary judgment should be granted on C&I's bad faith claim because F&D had an arguable basis for denying C&I's claim on the performance bond. (F&D's Memorandum, Docket No. 87, at 25-30.) Specifically, F&D contends that it relied on McKnight's defenses when it denied C&I's claim on the performance bond and that such reliance gave them an arguable basis for denying C&I's claim. (*Id.* at 28-30.) However, F&D's argument misconstrues Mississippi law and Fifth Circuit precedent for analyzing what constitutes an arguable basis for denying a claim.

21

In order to succeed on a bad faith claim, a plaintiff must establish, as a threshold matter, that coverage exists[2] and then demonstrate the following: (1) that the defendant lacked an arguable or legitimate basis for denying the claim; and (2) that the defendant committed a willful or malicious wrong or acted with gross and reckless disregard for the plaintiff's rights.[3] *State Farm Mut. Auto. Ins. Co. v. Grimes*, 722 So.2d 637 (Miss. 1998). When evaluating whether the defendant lacked an arguable of legitimate basis for denying the claim, the court must look only to the stated reason for denying the plaintiff's claim. *Sobley*, 210 F.3d at 564. The Fifth Circuit, when applying Mississippi bad faith law, explained as follows:

> Under Mississippi law, an insurer may rely on any exclusion in the policy to show that no coverage existed, whether or not that exclusion was the stated basis for denial. <u>However, once coverage is established, a court should evaluate whether there was an arguable basis for denial of coverage based solely on the reasons for denial of coverage given to the insured by the insurance company.</u>

*Id.* (emphasis added); *see also Eichenseer*, 682 F. Supp. at 1372 ("A court must look to the reason [the defendant] gives to [the plaintiff] for denying the claim . . . ."); *Bankers Life & Casualty Co. v. Crenshaw*, 483 So.2d 254, 273 (Miss. 1985) ("The issue is . . . the reason [the defendant] gave [the plaintiff] for denying the claim."). The Fifth Circuit reaffirmed this rule in 2006. *Hand v. UNUM Provident Corp.*, 202 Fed. Appx. 689, 694 (5th Cir. 2006). The rationale underlying the court's focus solely on the stated grounds for denial is that the defendant has a "continuing duty to reevaluate its position when it chooses to deny a claim." *Eichenseer*, 682 F. Supp. at 1372. A surety can still be liable for bad faith where it initially denies a claim without

---

[2] C&I's arguments that coverage existed can be found in Part II, *supra*.

[3] Notably, F&D has moved for summary judgment <u>only</u> on the basis that there was no arguable basis for denying C&I's claim on the performance bond. (F&D's Memorandum, Docket No. 87, at 25-30.) Because F&D has not moved for summary judgment on the grounds that it did not commit a willful or malicious wrong or act with gross and reckless disregard for C&I's rights, this issue is not before this Court. (*See id.*)

an arguable basis for doing so and then later pays out on the claim. *Id.* Thus, this Court must look to the grounds F&D provided to C&I when denying C&I's claim on the performance bond.

On March 3, 2005, Thomas Finley, claims counsel for F&D, sent a letter to C&I's counsel denying C&I's claim as follows:

> Section 9 of the performance bond provides a two year statute of limitations. Ralph McKnight & Son Construction Company ceased working on the project more than two years ago. Accordingly, we must respectfully deny C&I Entertainment's claim.

(Finley letter to C&I on March 3, 2005, Docket No. 86-9.) The <u>only</u> reason F&D gave for denying C&I's claim was based on a statute of limitations found in the terms of the performance bond. (*See id.*; Finley Dep. at 299: 5-17.) Accordingly, this Court is faced with only one question—namely, whether this contractual limitations period provided an arguable basis for denying C&I's claim on the performance bond. *See Sobley*, 210 F.3d at 564.

Section 9 of the performance bond provides as follows:

> Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

(Performance Bond, Docket No. 86-2, at § 9.) This is clearly an illegitimate basis for denying C&I's claim. First of all, Mississippi law is clear that parties cannot modify a statute of limitations by contract. Miss. Code Ann. § 15-1-5. Any contractual modifications of a limitations period are null and void. *Id.* It is undisputed that Section 9 of the performance bond did not provide legitimate grounds for denying C&I's claim. Accordingly, F&D's denial lacked

an arguable basis, and this Court should deny it's Motion for Summary Judgment as to C&I's bad faith claim.

Additionally, even apart from the fact that contractual modification of a statute of limitations is prohibited by Mississippi law, a review of Section 9 reveals that its terms are irrelevant to whether C&I's claim on the performance bond is valid. (*See* Performance Bond, Docket No. 86-2, at § 9.) Section 9 deals only with whether C&I may bring suit on the bond. (*Id.*) It contains no language mandating that C&I submit a claim on the performance bond to F&D within two (2) years of McKnight's last work on the project. (*See id.*) Thus, the circumstances of the denial plainly indicate that F&D denied C&I's claim solely because it (wrongfully) believed C&I was barred from instituting legal action against F&D. (*See* Finley Dep. at 297:19-24; 299: 5-17.) Mr. Finley testified to as much in his deposition:

> Q:     And I'm asking you, again, whether your decision to deny the claim was because C&I could no longer pursuant to paragraph 9 bring suit against F&D to enforce that claim.
>
> A:     I think that's what my letter indicates.

(*Id.* at 297:19-24.) Accordingly, F&D's denial of C&I's claim—grounded only on the contractual limitations period—was entirely without an arguable basis, and F&D's Motion for Summary Judgment as to C&I's bad faith claim should be denied.

Moreover, even assuming the contractual limitations period was enforceable, McKnight had performed work on the property within two (2) years of the denial. (McKnight fax to C&I on April 7, 2003, Docket No. 86-6, at 26; McKnight fax to F&D on April 19, 2005, Docket No. 86-11.) On August 26, 2004, prior to F&D's denial of C&I's claim, counsel for C&I sent F&D information supporting C&I's claim on the performance bond. (Koerber letter to F&D on August 26, 2004, Docket No. 86-6.) Included in this information was documentation indicating

that McKnight had worked on the property as recently as April 7, 2004.[4]  (McKnight fax to C&I

on April 7, 2003, Docket No. 86-6, at 26.)  Post-denial, F&D contacted McKnight, who

confirmed that it worked on the property on April 24, 2004.  (McKnight fax to F&D on April 19,

2005, Docket No. 86-11.)  Although F&D's claims correspondence distinguishes this April 2004

work as "warranty work," the performance bond did not define "work" or exclude coverage for

"warranty work."  (*See generally* Performance Bond, Docket No. 86-2.)  Thus, F&D's denial of

Plaintiff's claim is unfounded in both fact and law.

F&D's contention that it was entitled to rely upon McKnight's defenses is immaterial and

misleading.  (*See* F&D's Memorandum, Docket No. 87, at 28-30.)  At the time of denial, F&D

did not state any of McKnight's defenses as grounds for denying C&I's claim.  (Finley letter to

C&I on March 5, 2003, Docket No. 86-9.)  Only F&D's stated grounds are relevant to

determining whether an arguable basis existed.  *See Sobley*, 210 F.3d at 564.  Accordingly, the

fact that "McKnight and C&I clearly had legitimate disputes between them concerning the

quality and scope of McKnight's work on the Project," (F&D's Memorandum, Docket No. 87, at

---

[4] F&D alleges that counsel for C&I only "provided F&D a few of the requested documents." (F&D's Memorandum, Docket No. 87, at 28-29.)  Even though this allegation is not material to F&D's Motion for Summary Judgment, Plaintiff will address it nonetheless.

F&D's own "Best Practices Guide" requires F&D to perform an "independent investigation," which is defined as "free from the influence and control of the principal."  (Best Practices Guide at 1, *attached hereto as Exhibit G*.)  F&D was under a duty to collect adequate information from both C&I and McKnight in order to assess the merits of C&I's claim.  (*Id.* at 1-2.)  Despite these requirements, Mr. Finley relied on McKnight's counsel, a biased party, to provide the grounds for denying C&I's claim on the bond.  (*See* Finley Dep. at 199:4-13; 297:19-24; 299: 5-17.)  Moreover, prior to denying C&I's claim, Mr. Finley sought documentation underlying the claim only from C&I, despite his acknowledgement that McKnight would have possession of relevant documents.  (Finley Dep. at 139:17—142:8; 223:11—224:9.)  Counsel for C&I clearly gave F&D all documents in its possession and cannot be faulted for F&D's failure to request documents from McKnight.  (*See* Koerber letter to F&D on August 26, 2004, Docket No. 86-6 ("[M]ost of the information which you requested is unavailable.").)

28), has no bearing whatsoever on the lack of arguable basis for denying C&I's claim on contractual limitations grounds. *See Sobley*, 210 F.3d at 564.

Furthermore, the cases cited by F&D do support the proposition that an arguable basis existed upon which to deny C&I's claim. (*See* F&D's Memorandum, Docket No. 87, at 25-28 (citing *McQueen Contracting, Inc.*, 871 F.2d 32; *Georgia Elec. Supply Co. v. U.S. Fidelity & Guar. Co.*, 656 F.2d 993 (5th Cir. Ga. 1981).) First of all, *Georgia Electric Supply Company* is a Miller Act claim, which is governed by federal law. *Georgia Elec. Supply Co.*, 871 F.2d at 996; *F.D. Rich, Inc. v. U.S. ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129 (1974). The plaintiff there did not assert a bad faith claim for punitive damages under Mississippi law, but instead sought attorney's fees pursuant to federal law. *Georgia Elec. Supply Co.*, 871 F.2d at 996-97. Its claim for attorney's fees did not require the plaintiff to prove the lack of an arguable basis to deny the claim. *See id.* Accordingly, *Georgia Electric* has no bearing on the case at bar because it does not interpret Mississippi law. Whatever *Georgia Electric* states about attorney's fees under the Miller Act is irrelevant here, where Mississippi law requires that the Court analyze whether F&D had an arguable basis for denying C&I's claim solely based off the stated grounds for denial. *See Sobley*, 210 F.3d at 564.

*McQueen Contracting, Inc.* also fails to support F&D's position. F&D erroneously contends that, in *McQueen Contracting*, the Fifth Circuit "held that a surety who legitimately relies on the principal's substantive defenses to payment cannot be liable in an action for bad faith refusal to pay." (F&D's Memorandum, Docket No. 87, at 25.) However, F&D's contention is an incorrect statement of Mississippi law and irrelevant to the facts at hand.

In *McQueen*, a subcontractor brought suit against the surety to enforce a payment bond. 871 F.2d at 34-35. The surety contended that there was a factual dispute whether the contractor

had paid the subcontractor or not. *Id.* The Court held that this was an arguable basis for denying

the subcontractor's claim because, if the subcontractor had been paid, there could be no claim on

the payment bond. *Id.* Importantly, the Court was not tasked with analyzing the surety's

arguable basis only in light of its stated reasons for denying the subcontractor's claim because

the subcontractor had failed to raise this argument until a reply brief for rehearing before the

Fifth Circuit. *Id.* at 34 n.4. The Court stated as follows: "[The subcontractor] argues for the first

time in its Reply to F & D's Response to the Petition for Rehearing that F & D's trial defenses

cannot be relied upon as arguable bases for the denial for McQueen's claims. We, however,

decline to consider arguments made for the first time at this late stage." *Id.* Because of the

subcontractor's failure to timely raise the issue, the outcome of *McQueen* has little precedential

value. Indeed, the Fifth Circuit applying Mississippi law <u>after *McQueen* was decided</u> has

consistently restricted the arguable basis analysis to the defendant-surety's stated reasons at the

time of the denial. *See Sobley,* 210 F.3d at 564 (decided in 2000); *Hand*, 202 Fed. Appx. at 694

(decided in 2006).

       Even assuming the outcome of *McQueen* had any precedential value, the decision still

would not be relevant to the case at bar. F&D's denial letter <u>did not assert</u> that it was denying

C&I's claim based on one of McKnight's defenses, so any entitlement to rely on McKnight's

defense is not at issue here. (*See* Finley letter to C&I on March 5, 2003, Docket No. 86-9.)

F&D denied C&I's claim on independent grounds derived from the terms of the performance

bond. (*Id.*) This Court must assess whether this particular reason provided an arguable basis for

denying C&I's claim. *Sobley,* 210 F.3d at 564; *Hand*, 202 Fed. Appx. at 694. Because this

reason did not provide an arguable basis for denying C&I's claim, this Court must deny F&D's

Motion for Summary Judgment.

Finally, F&D contends that C&I has "admit[ted] that McKnight disputed C&I's claim and that F&D adopted and was relying on McKnight's position of non-liability." (F&D's Memorandum, Docket No. 87, at 29.) F&D cites this Court's Agreed Order on F&D's Motion to Stay pending resolution of the State Court action between C&I and McKnight, (Agreed Order, Docket No. 37), and further asserts that it never revoked its right to rely on McKnight's defenses. (F&D's Memorandum, Docket No. 87, at 29.) However, this Court's Order staying the instant action and F&D's alleged reservation of rights is irrelevant to this Court's analysis whether F&D had an arguable basis for denying C&I's claim.

Nothing in the Order staying the instant action precludes C&I or this Court from restricting the arguable basis analysis solely to F&D's stated grounds for denial—namely, the limitations period in the performance bond. The Order staying the instant action is relevant <u>only</u> to coverage. (*See* Agreed Order, Docket No. 37.) If McKnight had not breached the construction contract, C&I would not have had a claim against F&D at all—whether for breach of the performance bond or bad faith denial. Under Mississippi law, in order to succeed on a claim for bad faith denial, the plaintiff must first demonstrate the existence of coverage. *Sobley*, 210 F.2d at 564. The Fifth Circuit, applying Mississippi law, has expressly held that a surety can rely on <u>any defense</u>—whether or not stated as grounds for denial—when arguing that <u>coverage</u> does not exist. *Id.* However, once coverage is established, the surety must have had an arguable basis for denying the claim <u>specifically for the reasons the surety provided to the obligee</u>. *Id.*

In other words, C&I has <u>never</u> conceded that F&D adopted and was relying on McKnight's position of non-liability <u>at the time when F&D denied C&I's claim on the performance bond</u>. The Order staying the instant action recognizes only that the parties would be "bound by the decision of the Circuit Court of Attala County regarding the construction

contract between C&I and McKnight, specifically whether or not McKnight defaulted on the construction contract it entered into with C&I for the Project." (Agreed Order, Docket No. 37, at ¶ 6.) It is of no importance whether or not F&D revoked its right to rely on McKnight's defenses. As a matter of Mississippi and Fifth Circuit law, the reason F&D actually provided to C&I as the basis for the denial is the only reason this Court may analyze when determining whether an arguable basis for denial existed. *See Sobley*, 210 F.2d at 564; *Hand*, 202 Fed. Appx. at 694. Because F&D, in its March 3, 2005, letter to C&I, did not state that it was denying C&I's claim on grounds of any of McKnight's defenses, the sufficiency of McKnight's defenses are not at issue on the arguable basis prong. Whether McKnight's defenses are relevant to other issues in the instant action is another matter. As to the existence of an arguable basis—the specific grounds on which F&D moved for summary judgment—unstated bases for denial are irrelevant. Accordingly, this Court must deny F&D's Motion for Summary Judgment.

V.    **This Court should deny F&D's Motion for Summary Judgment because C&I seeks damages other than those assessed against McKnight, Section 6 permits C&I to recover attorney's fees, and there are genuine issues of material fact as to whether Section 6 has been triggered.**

F&D contends that it is entitled to summary judgment on C&I's claim for attorney's fees from the lawsuit between C&I and McKnight and from the instant action. (F&D's Memorandum, Docket No. 87, at 16-17, 30-32.) First, F&D contends that C&I has no damages because McKnight satisfied the damages assessed against it in the State Court action against C&I. (*Id.* at 16-17.) However, the damages that C&I seeks are not duplicative. C&I seeks damages for the attorney's fees incurred in prosecuting the State Court action against McKnight and in prosecuting the instant action. Attorney's fees were not awarded in the State Court action. Thus, C&I seeks recoverable damages.

Additionally, F&D contends that Section 6 of the performance bond, which provides for attorney's fees, has not been triggered.  (*Id.*)  However, Section 6 permits C&I to recover attorney's fees and expenses both from the instant action and the legal proceedings against McKnight.  Alternatively, Section 6 is ambiguous, which prevents this Court from granting summary judgment.

Section 6 permits C&I to recover from F&D "[a]dditional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4 . . . ."  (Performance Bond, Docket No. 86-2, at § 6.2.)  To the extent that F&D contends that Section 6 has not been triggered because the performance bond's conditions precedent have not been met, C&I adopts and incorporates Part II of its Response.  *See* Part II, *supra*.  There are clearly genuine issues of material fact as to whether C&I (1) gave notice of its intent to declare McKnight in default; (2) terminated McKnight; (3) declared McKnight in default; and (4) agreed to pay the balance of the monies owed McKnight to F&D.  *Id.*  Thus, there are material factual disputes as to whether Section 6 was triggered that prevent this Court from granting F&D's Motion for Summary Judgment.

Additionally, Section 6 entitles C&I to recover attorney's fees both from the lawsuit against McKnight and the instant action.  A plain reading of Section 6 commits F&D to all additional legal costs.  (Performance Bond, Docket No. 86-2, at § 6.)  There is no language restricting recoverable legal costs to those arising from the instant action only.  (*See id.*)  Accordingly, Section 6 covers legal costs incurred <u>both</u> during the instant action <u>and</u> during the legal action against McKnight.  (*See id.*)

Finally, Section 6 contains ambiguities that prevent this Court from granting summary judgment as to its interpretation.  A performance bond is subject to the rules of contract

interpretation, *L. Schreiber & Sons Co.*, 87 S.E. at 355, and, as with an insurance contract, it should be construed liberally in favor of the obligee. *See Burton*, 730 So. 2d at 8. Although contract interpretation is typically a question of law, any ambiguities present a question of fact. *Royer Homes of Miss., Inc. v. Chandeleur Homes, Inc.*, 857 So.2d 748, 751-52 (Miss. 2003). The entire construction of Section 6, as well as provision 6.2 in particular, is ambiguous. Specifically, the first sentence of Section 6 likely belongs in a separate section. (*See* Performance Bond, Docket No. 86-2, at § 6.) The first sentence reads: "After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, and 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Owner under the Construction Contract." (*Id.*) F&D contends that this sentence imposes conditions on its liability for legal costs. (F&D's Memorandum, Docket No. 87, at 31.) However, this sentence applies in the event that F&D <u>acts on</u> C&I's claim, which has no bearing on the case at bar, where F&D has <u>denied</u> C&I's claim. (*See id.*)

Moreover, F&D contends that, according to provision 6.2, it is liable for legal costs only if they arise from McKnight's default <u>and</u> from F&D's own actions in relation to C&I's claim on the performance bond. (F&D's Memorandum, Docket No. 87, at 32.) However, despite the fact that provision 6.2 contains the term "and," the drafter likely intended the use of the disjunctive, rather than the conjunctive. (*See* Performance Bond, Docket No. 86-2, at § 6.2) Provision 6.2 subjects F&D to additional costs "resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Paragraph 4." (*Id.* (emphasis added).) Had the drafter intended the "and" to be conjunctive, there would have been no need to include the comma prior to the second term. (*Id.*) The placement of the comma implies separation and

31

exclusion; thus, the provision rightfully subjects F&D to legal costs "resulting from the Contractor's Default, <u>or those</u> resulting from the actions or failure to act of the Surety under Paragraph 4." (*See id.*) This is consistent with the purpose of the performance bond, which is to ensure compensation for all consequential losses in the event of the contractor's default, even where the surety acts on the obligee's claim. Accordingly, Section 6 is, at best, ambiguous, and this Court cannot grant summary judgment as to its interpretation.

## Conclusion

For the reasons stated above, Plaintiff C&I Entertainment, LLC, respectfully requests that this Honorable Court DENY Defendant Fidelity & Deposit Company of Maryland's Motion for Summary Judgment.

Respectfully submitted,

**GLASSMAN, EDWARDS, WYATT, TUTTLE & COX, P.C.**

BY:    /s/ Todd B. Murrah
TODD B. MURRAH (#8874)
Attorney for Plaintiff
26 North Second Street
Memphis, TN 38103
(901) 527-4673
(901) 521-0940 (fax)
tmurrah@gewwlaw.com
Our File:  08-003

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading has been properly forwarded via the Court's ECF system or via U.S. Mail, postage prepaid, to the following:

Ellie B. Word, Esq.
Alec M. Taylor, Esq.
Krebs, Farley & Pelleteri, PLLC
One Jackson Place
188 East Capitol Street
Jackson, MS  39201

this 20th day of December, 2013.

<u>  /s/   Todd B. Murrah         </u>.