**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**ABERDEEN DIVISION**

C & I ENTERTAINMENT, LLC                                    **PLAINTIFF**

**V.**                                                      **NO. 1:08CV00016-DMB-DAS**

**FIDELITY AND DEPOSIT COMPANY**
**OF MARYLAND**                                             **DEFENDANT**

**MEMORANDUM OPINION AND ORDER DENYING**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this construction bond case, Defendant Fidelity & Deposit Company of Maryland

("Fidelity") has filed its second motion for summary judgment seeking a ruling that it is not

liable as a matter of law to Plaintiff C&I Entertainment, LLC ("C&I"), for breach of contract and

bad faith. For the reasons that follow, summary judgment is denied.

**I**
**Factual and Procedural Background**

On or about August 7, 2001, C&I contracted with Ralph McKnight & Son Construction,

Inc. ("McKnight"), to build a movie theater and skating rink ("Project") in Kosciusko,

Mississippi. McKnight obtained a performance bond ("Bond") from Fidelity. The Bond, an

AIA A312 standard bond, named C&I as Owner, McKnight as Contractor, and Fidelity as

Surety. In addition, McKnight and Fidelity signed an indemnity agreement obligating McKnight

to repay to Fidelity any sums Fidelity may pay to C&I under the Bond.

After a significant portion of the Project was complete, a dispute arose between C&I and

McKnight over the quality of the construction.[1]  C&I withheld final payment, consisting of

retainage only. The summary judgment record indicates that on June 16, 2003, C&I, through

---

[1] C&I had problems with the roof, the restrooms, the floors, the HVAC system, the lighting, and several other
aspects of the Project.

one of its owners, Emma Ivester, sent Fidelity a letter describing McKnight's deficient work and failed repair attempts, and asked Fidelity to "discuss and resolve a satisfactory solution to us." In the letter, which referenced and attached multiple letters that C&I had sent to McKnight complaining about deficiencies in the work, Ivester stated, among other things, that the Project reached substantial completion on November 15, 2002, as to the movie theater and January 23, 2003, as to the skating rink. Fidelity claims it has no record of ever receiving this letter.

On June 19, 2003, McKnight filed a construction lien against the Project. On August 29, 2003, McKnight filed a complaint against C&I in the Circuit Court of Attala County, Mississippi ("State Court Action"), to enforce the construction lien, seeking the unpaid retainage. C&I filed an answer and counterclaim,[2] asserting that McKnight breached the construction contract.

On December 9, 2003, Glenda Burton-Horne, then counsel for C&I, wrote Fidelity advising that a negotiation with McKnight was in progress toward a proposed settlement of damages and lost revenues, and that "if a full settlement does not occur relief may be sought under the Bond as issued in this matter." The letter also stated that the Project's completion date was February 23, 2003. However, facsimiles from McKnight to Fidelity indicate that McKnight performed work on the Project as late as April 2003. Fidelity took no action upon receipt of Burton-Horne's letter.

On May 24, 2004, Paul Koerber, C&I's new attorney, wrote Fidelity making a demand on the Bond. Pointing out that notice had been previously provided to Fidelity of McKnight's failure to perform the construction contract and advising that "[t]he owner, C&I Entertainment, has declared the contractor's default and has terminated its services," Koerber asked that Fidelity contact C&I within fourteen days.

---

[2] C&I's response to the summary judgment motion indicates that its answer was filed on January 9, 2004. However, only its amended answer dated March 22, 2005, was made part of the summary judgment record. C&I's counterclaim against McKnight in the State Court Action was filed on March 3, 2005.

A copy of Koerber's May 24 demand letter to Fidelity was provided to McKnight's counsel, Robert Dambrino. After reviewing the letter, Dambrino wrote McKnight's insurance agent on June 1, 2004, disputing the accusations made against McKnight in Koerber's letter. Dambrino's letter stated that C&I had unilaterally declared McKnight in default and unilaterally locked McKnight out of the Project. The letter also stated, among other things, that C&I had not complied with certain provisions of Paragraph 3 of the Bond.

A copy of Dambrino's June 1 letter was sent to Thomas Finley, claims counsel for Fidelity. On June 3, 2004, Finley responded to Koerber's May 24 letter and requested documents to assist with his claim investigation. Finley's letter also stated:

> Our activities are undertaken with a full reservation of our rights and defenses as well as our Principal's rights and defenses under the terms of the bond, the contract, at law and in equity. This reservation of rights shall remain in full force and effect unless expressly revoked in writing by F&D.

On August 26, 2004, Koerber replied to Finley's June 3 letter, enclosing documents in response to Finley's request. The documents included multiple items of correspondence from C&I to McKnight regarding deficiencies with the construction project. Koerber also invited Fidelity to inspect the Project as soon as possible, advising that severe problems still remained with McKnight's workmanship, and again demanded that Fidelity perform under the Bond. The letter ended, "No claims, causes of action, rights or interests are waived by this correspondence."

On November 5, 2004, Koerber wrote Finley inquiring about the status of C&I's bond claim. Koerber advised that, due to McKnight's faulty construction and Fidelity's failure to perform under the Bond, potential risks to C&I's patrons, and potential liability to C&I, were causing C&I to consider ceasing operations.

A week later, on November 12, 2004, Finley responded to Koerber by letter, asking that he call to discuss a date for inspection of the Project. Referring to the ongoing litigation between

McKnight and C&I, Finley advised that he would like McKnight to participate in the inspection. Also informing Koerber that under Paragraph 3.1 of the Bond, a meeting must occur between the contractor, surety and owner, Finley stated that the "inspection could also serve to satisfy Section 3.1 of the performance bond." On November 23, 2004, representatives of Fidelity and C&I inspected the Project. No representative of McKnight attended the inspection. The parties disagree as to whether McKnight was invited.

By letter dated March 3, 2005, Fidelity denied C&I's claim on the Bond. The one paragraph letter stated as the sole basis for the denial:

> Section 9 of the performance bond provides a two year statute of limitations. Ralph McKnight & Son Construction Company ceased working on the project more than two years ago. Accordingly, we must respectfully deny C&I Entertainment's claim.

On March 28, 2005, Koerber wrote Finley about Fidelity's denial of the claim, asking Finley to produce "specific information, documents and/or witness statements" supporting the determination that McKnight had not worked on the Project for over two years, and information supporting Fidelity's determination that a two-year statute of limitations applied. Also, in over three pages of his five-page letter, Koerber asked Fidelity to preserve and not destroy certain specified data, communications, and evidence related to the bond claim.

Fidelity formally retained counsel, Alberta L. Adams, to respond to Koerber's March 28, 2005, letter. Adams wrote Koerber on May 11, 2005, enclosing documentation received from McKnight that McKnight claimed showed it had last worked on the Project on February 7, 2003, and last performed warranty work on April 24, 2003. Adams also requested certain documentation from C&I "under a full reservation of rights and defenses." The letter further directed C&I to Paragraph 3.3 of the Bond, which Adams stated "requires that the owner agree to pay the balance of the contract price to the surety to trigger any obligation of the surety under the

Bond." C&I did not respond to Adams' May 11 letter. Emma Ivester testified at deposition that she never saw the letter.

On December 27, 2007, C&I filed suit against Fidelity in the Circuit Court of Attala County, Mississippi, alleging breach of contract and bad faith denial of a claim, and seeking compensatory damages, punitive damages, and attorney's fees and expenses. On January 18, 2008, Fidelity removed the action to this Court.[3] On March 28, 2008, Fidelity filed its first motion for summary judgment, arguing that the three-year statute of limitations in Miss. Code Ann. § 15-1-49 barred C&I's claim. Through order dated October 27, 2008, summary judgment was denied.[4] Subsequently, on March 20, 2009, the case was stayed pending the outcome of the State Court Action between McKnight and C&I. The State Court Action was tried on March 8-10, 2011, and resulted in a jury verdict against McKnight in the amount of $300,845.67, which verdict was upheld on appeal on November 13, 2012. McKnight paid the judgment, and C&I filed a satisfaction and release of judgment on December 22, 2012. On January 1, 2013, the stay in this action was lifted.

Fidelity filed the instant motion for summary judgment on all claims on November 20, 2013. Doc. #86. The Court held oral argument on the fully-briefed motion[5] on July 2, 2014, and is now prepared to rule.

---

[3] Because the jurisdictional allegations in Fidelity's removal notice were deficient with respect to C&I's citizenship, the Court issued a show cause order on March 13, 2014, directing Fidelity to submit competent evidence as to the citizenship of all of C&I's members at the time of removal. After reviewing Fidelity's response, the Court finds that Fidelity has met its burden of demonstrating by a preponderance of the evidence the existence of complete diversity pursuant to 28 U.S.C. § 1332.

[4] The motion was denied by U.S. District Judge Michael P. Mills. The case was reassigned to the undersigned District Judge on January 3, 2014.

[5] C&I filed its response on December 20, 2013, and Fidelity filed its reply on January 17, 2014. Thereafter, C&I was allowed to file a sur-reply and Fidelity was given an opportunity to respond, though it did not file a timely response. Fidelity was allowed to file a supplemental brief, to which C&I timely responded.

## II
## Standard of Review

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(a) ("The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law"). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In reviewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, and avoid credibility determinations and weighing of the evidence. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 250.

## III
## Analysis

Fidelity argues that it is entitled to summary judgment on C&I's breach of contract claim and C&I's bad faith claim. Each is discussed separately below.[6]

### A. Breach of Contract

Fidelity argues that it is not liable for breach of contract because C&I did not comply with the provisions of Paragraph 3 of the Bond, which are conditions precedent that must be

---

[6] Because jurisdiction in this case is based on diversity of citizenship, the Court will look to the substantive law of Mississippi in resolving the parties' disputes. *See Hanley v. Forester*, 903 F.2d 1030, 1032 (5th Cir. 1990) ("a federal court sitting in a diversity case is obligated to apply the substantive law of the state in which it is sitting").

fulfilled before Fidelity's obligations are triggered. Fidelity also argues that, to the extent that McKnight satisfied the judgment rendered against it in the State Court Action, Fidelity cannot be liable to C&I. Finally, Fidelity contends that it is not liable to C&I for attorney's fees from the State Court Action.

*1. Conditions Precedent*

Paragraph 3 of the Bond provides that "[i]f there is no Owner Default, the Surety's obligations under the Bond shall arise after":

> 3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor, and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor default.
>
> 3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor default shall not be declared earlier than twenty days after the Contractor and Surety have received notice as provided in Sub-paragraph 3.1.
>
> 3.3 The Owner has agreed to pay the Balance of the Contract price to the surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the Contract with the Owner.

A performance bond is a contract and is subject to the general rules of contract interpretation. *See Fid. & Guar. Ins. Co. v. Blount*, 63 So. 3d 453, 461 (Miss. 2011) (suretyship relationship, being contractual in nature, is governed generally by familiar rules of contract law).[7] Failure to comply with conditions precedent in a contract renders the contract unenforceable against the enforcing party. *See Austin v. Carpenter*, 3 So. 3d 147, 149 (Miss. Ct.

---

[7] A compensated surety, such as Fidelity here, is not entitled to a strict or technical construction of the contract, rather, the obligation is to be considered in the same light as any other contract. *Hartford Accident & Indem. Co. v. Hewes*, 199 So. 93, 98 (Miss. 1940).

App. 2009) (defining "condition precedent" as "a condition which must be fulfilled before the duty to perform an existing contract arises") (citations omitted); *Donahoo v. State Farm Mut. Auto. Ins. Co.*, 684 F. Supp. 911, 913 (N.D. Miss. 1987) ("The Mississippi Supreme Court repeatedly has held that conditions precedent to recovery under an insurance contract…are enforceable").

Fidelity argues that other courts have examined the AIA A312 performance bond, like the Bond here, and found that it contains conditions precedent that must be met before the surety's obligations arise. Fidelity relies on *Bank of Brewton, Inc. v. International Fidelity Insurance Co.*, 827 So. 2d 747, 754 (Ala. 2002), in which the court found that "[t]he plain language of paragraph 3 is that in the event of a contractor default, the surety's obligation under the bond shall arise after the occurrence of the events listed in subparagraphs 3.1, 3.2, and 3.3." *Id. See also Mid-State Sur. Corp. v. Thrasher Eng'g, Inc.*, 575 F. Supp. 2d 731, 741 (S.D. W. Va. 2008) ("numerous other courts have [interpreted the language of the A312 bond] and have come to the same conclusion to which this court comes today, namely, that the provisions of paragraph 3 create conditions precedent which must be satisfied by the owner…before the surety has any obligation under the Bond"); *AgGrow Oils, LLC v. Nat'l Union Fire Ins. Co.*, 276 F. Supp. 2d 999, 1017 (D. N.D. 2003) (finding that requirements of paragraph 3 are conditions precedent to surety's bond performance). C&I agrees that Paragraphs 3.1, 3.2, and 3.3 are conditions precedent but argues that it has complied with them or, at the very least, there are genuine issues of material fact regarding its compliance that make summary judgment inappropriate.

No Mississippi cases appear to have interpreted Paragraph 3 of the AIA A312 bond; however, the Court agrees with the parties that Paragraphs 3.1, 3.2, and 3.3 of the Bond are conditions precedent to Fidelity's obligations under the Bond. Conditions precedent, however,

including those in a performance bond, may be waived, "either expressly or by implication resulting from acts or conduct, by the party in whose favor they are made."[8] *AgGrow Oils*, 276 F. Supp. 2d at 1017-18. *See Ravenstein v. Cmty. Trust Bank*, No. 2012-CA-00659, 2013 WL 3991847, at *5 (Miss. Ct. App. Aug. 6, 2013) ("it is well settled that a contracting party may unilaterally waive a provision of the contract, including…any condition precedent, which has been placed in the contract for his or her benefit," citing 13 *Williston on Contracts* § 39:24); *Canizaro v. Mobile Communications Corp. of Am.*, 655 So. 2d 25, 29 (Miss. 1995) ("[w]ith respect to waivers in general, this Court has long held that a party to a contract may by words or conduct waive a right to which he would otherwise have been entitled").

There does not appear to be any Mississippi cases discussing waiver of the conditions precedent in an AIA A312 performance bond but the facts of the present case are analogous to those in *AgGrow Oils.* In that case, the surety's response letter to the obligee's claim of default was "a resounding and unequivocal declaration that it had completed performance and was not liable under the bond." 276 F. Supp. 2d at 1017. The court found that, "[u]nder these circumstances, any formal notice of termination or payment of the contract balance, would have been 'futile' and a 'useless formality.'" *Id.* at 1018 (citations omitted). Thus, the obligee was excused from performing the conditions precedent. *Id.*

In the present case, Fidelity's denial letter referenced only the two-year statute of limitations contained in the Bond. Fidelity did not raise any of Paragraph 3's conditions precedent, or anything other than the Bond's statute of limitations, as a reason for denying the

---

[8] At oral argument, Fidelity's counsel agreed that the conditions precedent in the Bond could be waived but argued they had not been waived. C&I's counsel argued waiver by Fidelity at oral argument, although C&I did not use the word "waiver" in its briefs. Regardless, "[c]ourts must focus on the substance of the relief sought and the allegations pleaded, not on the label used." *Geralds v. Entergy Services, Inc.*, 709 F.3d 448, 452 (5th Cir. 2013). *See Montalvo v. Bank of America Corp.*, No. SA-10-CV-360, 2013 WL 870088, at *7 (W.D. Tex. Mar. 7, 2013) (simply because plaintiff did not use label "waiver" did not mean court should overlook merits of her claim).

claim. Although Fidelity's counsel mentioned Paragraph 3.3 of the Bond in her May 11, 2005, letter, Fidelity did not premise its basis for denying C&I's claim on it, neither in that letter nor at any other point.[9] Thus, the Court must examine not only whether C&I complied with each of Paragraph 3's conditions precedent[10] but also whether Fidelity waived its right to have C&I comply, in whole or part, such that any later efforts by C&I to comply would have been "futile." In this regard, the Court will discuss each of the conditions precedent in turn.

a. Paragraph 3.1

Paragraph 3.1 requires C&I to notify Fidelity and McKnight that it is "considering declaring a Contractor Default," and to attempt to arrange a meeting with all three parties not later than fifteen days after such notice is given. The parties center their arguments about Paragraph 3.1's "considering declaring a Contractor Default" requirement on the December 9, 2003, letter that C&I's counsel Burton-Horne sent to Fidelity. Fidelity argues that the December 9 letter omitted the necessary "considering default" language and instead put Fidelity on notice that a negotiation was in progress, not that a default might be forthcoming. C&I argues that the letter satisfied Paragraph 3.1 in that the letter should have alerted Fidelity that a claim on the Bond would be pursued if the dispute with McKnight was not resolved. According to C&I, it was implicit in the letter that C&I was considering a default.

Interestingly, in their arguments concerning Paragraph 3.1, neither party discusses Ivester's June 16, 2003, letter written on C&I's behalf. That letter discussed McKnight's deficient work in detail and "request[ed] [the] bonding company to discuss and resolve a satisfactory solution to us." When questioned about this letter during oral argument, Fidelity

---

[9] At oral argument, Fidelity's counsel confirmed that Fidelity never amended the basis for its denial or advised C&I of any other reason for denial other than the Bond's statute of limitations.

[10] The Court notes that in an earlier order denying Fidelity's first motion for summary judgment before the case was assigned to the undersigned District Judge, the Court found that C&I had "met these conditions precedent."

stated that it had no record of having received it. C&I argued that Ivester's June 16 letter and Burton-Horne's December 9 letter essentially say the same thing, and both would have put Fidelity on notice that C&I was considering declaring a default.

In *Mid-State Surety Corp.*, the court found that, with respect to compliance with the conditions precedent of an A312 performance bond, "forfeiture on technical grounds is not favored." 575 F. Supp. 2d at 742. For the same reason, this Court finds that Paragraph 3.1 does not require the words "considering default" or any precise language as long as the substance of the communication would have put Fidelity on notice that C&I was indeed "considering a Contractor Default." Even the Bond's definition of "Contractor Default" does not use the word "default," defining it as the "[f]ailure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract."

Ivester's June 16 letter may be deemed to provide notice to Fidelity of such, but an issue of fact exists as to whether Fidelity received it. Burton-Horne's December 9 letter is not as explicit as Ivester's June 16 letter regarding C&I's problems with McKnight. Finley, Fidelity's claims counsel, testified at deposition that the December 9 letter would have prompted him to open a claims file.[11] Ultimately, whether the December 9 letter, standing alone (or with the June 16 letter), provided notice to Fidelity that C&I was considering defaulting McKnight is an issue for the jury.

With respect to Paragraph 3.1's requirement that C&I request and attempt to arrange a conference with McKnight and Fidelity, C&I argues that it attempted to set up such a meeting, and that a meeting with representatives from C&I and Fidelity was held on November 23, 2004.

---

[11] Finley was not employed with Fidelity at the time of Burton-Horne's December 9, 2003, letter to Fidelity. He testified that, had he received Burton-Horne's letter, it would have put him on sufficient notice of a dispute between C&I and McKnight as to the quality of work such that he would have opened a claims file.

Neither Ivester's June 16 letter nor Burton-Horne's December 9 letter mentioned setting up a meeting of C&I, McKnight and Fidelity. Koerber's August 26, 2004, letter to Finley did not either, since it extended an invitation only to Fidelity for only an inspection. But, in the November 12, 2004, letter from Finley to Koerber, Finley proposed a site inspection in which all three parties could participate and which he stated "could also serve to satisfy Section 3.1 of the performance bond." Although McKnight did not attend the subsequent inspection, there is a factual dispute as to whether it was invited. Thus, whether C&I attempted to arrange a Paragraph 3.1 meeting is a subject of genuine dispute.

As for the requirement that the meeting take place not later than fifteen days after the "considering default" notice, a factual issue exists regarding whether it was waived by Fidelity when Finley remarked that the planned inspection could serve to satisfy Paragraph 3.1. In short, genuine and material factual disputes preclude summary judgment regarding the issue of C&I's compliance with Paragraph 3.1.

b. Paragraph 3.2

Paragraph 3.2 required C&I to declare McKnight in default and terminate McKnight. Fidelity argues that the absence of a declaration of default renders the Bond and the surety's obligations null and void, and that mere threats cannot serve to trigger the obligations of a surety. C&I argues that its answer in the State Court Action asserted that McKnight was in default, and that courts have held the institution of litigation between an owner and contractor sufficient to satisfy Paragraph 3's termination requirement. Moreover, C&I argues that its May 24, 2004, letter clearly and unequivocally gave notice of default to Fidelity.

Fidelity relies on *L&A Contracting Co. v. Southern Concrete Services, Inc.*, 17 F.3d 106 (5th Cir. 1994), for its arguments. In that case, the obligee became concerned with the

principal's performance and sent a letter to the principal and surety requesting the surety to "take the necessary steps to fulfill this contract to prevent any further delays and costs to [the obligee]." *Id*. at 108. The surety did not respond to the letter and the principal was allowed to complete the contract. *Id*. The obligee later sued the surety for breach of contract. *Id*. The Fifth Circuit held:

> A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear direct and unequivocal language. The declaration must inform the surety that the principal has committed a material breach or series of material breaches of the subcontract, that the obligee regards the subcontract as terminated, and that the surety must immediately commence performing under the terms of its bond.

*Id*. at 111. *See also Hunt Constr. Group, Inc. v. Nat'l Wrecking Corp.*, 587 F.3d 1119, 1119-20 (D.C. Cir. 2009); *Dragon Constr., Inc. v. Parkway Bank & Trust*, 678 N.E.2d 55, 58 (Ill. App. Ct. 1997); *Bank of Brewton*, 827 So. 2d at 754. This Court agrees with Fidelity that when a performance bond requires the owner to declare the contractor in default, there must be a clear and unequivocal declaration.

C&I cites *Mid-State Surety Corp.* for the proposition that institution of litigation between an owner and contractor is sufficient to satisfy Paragraph 3. In that case, the court found that even if the declaration of default involved was not sufficient to terminate the contractor's right to complete the project, the filing of a civil action against the contractor was sufficient to terminate those rights. 575 F. Supp. 2d at 742-43.

Whether or not the litigation between McKnight and C&I should have put Fidelity on notice that McKnight was in default, Koerber's May 24, 2004, letter clearly advised Fidelity that C&I "has declared the contractor's default and has terminated its services." McKnight did not dispute its default status as evidenced by the June 1, 2004, letter of Dambrino, McKnight's counsel, in which he told Fidelity that C&I "unilaterally declared McKnight in default." Finley's

June 3, 2004, letter to Koerber also referred to C&I's demand letter as "your default letter." Moreover, C&I included default language in its answer to the State Court Action.[12]

Additionally, the Bond does not provide a time by which default had to be declared, providing only that it not be "earlier than twenty days" after Fidelity and McKnight received notice under Paragraph 3.1. Given the explicit default language used by C&I in its May 2004, letter, and acknowledgement by Fidelity and McKnight of the default, C&I satisfied the requirement that it declare McKnight's default.

Fidelity argues though that because the Project was substantially complete at the time of Koerber's May 24, 2004 letter, a default was legally impossible.[13] During oral argument, Fidelity emphasized the substantial completion dates of November 2002 for the movie theater and January 2003 for the skating rink in Ivester's June 16, 2003, letter; the February 2003 date in Burton-Horne's December 9, 2003, letter; and a certificate of occupancy issued on February 21, 2003, as evidence that the Project was complete. In response, C&I argues that facsimiles from McKnight to Fidelity indicate that work was done into late April 2003, and there is evidence that certain aspects of the Project were never completed. C&I also argues that Fidelity cited no contractual language requiring C&I to provide notice of default to Fidelity within a specified period, and cites authority holding that a default may be declared after the date of substantial completion, particularly if the contract covers warranty work, like the one here.

To support its proposition that a default is legally impossible after substantial completion, Fidelity relies heavily on *Sumrall Church of the Lord Jesus Christ v. Wayne Johnson d/b/a*

---

[12] Only C&I's amended answer filed March 22, 2005, was made part of the summary judgment record. According to C&I, its original answer was filed in January 2004 before its claim on the Bond had been made.

[13] Fidelity advances the same argument regarding Paragraph 3.1, citing the completion date in Burton-Horne's December 9, 2003, letter. Whether a default can be declared after substantial completion will be addressed in the context of this Paragraph 3.2 discussion, though the analysis also applies to any arguments by Fidelity regarding Paragraph 3.1.

*Johnson Electric*, 757 So. 2d 311, 315 (Miss. Ct. App. 2000); and also cites *Bank of Brewton* and *L&A Contracting*.  In *Sumrall*, the project owner argued that it was entitled to terminate the contract after substantial completion due to the contractor's material breach.  The court found that the crux of the owner's claim was that the work performed by the contractor was shoddy but could be corrected, by other persons, holding that the owner was not entitled to a termination, cancellation or rescission of its contract.  *Id*. at 315.  But, *Sumrall* is not a surety case, does not interpret the term "default," and does not discuss required warranty work.  Similarly, the *L&A Contracting* decision does not discuss the issue of whether a default can be declared after substantial completion.  And, in *Bank of Brewton*, while the court found that "[t]he clear intent of the performance bond, taken as a whole is for [the surety] to serve as an insurer for the completion of the project as a whole," 827 So. 2d at 753, the opinion did not discuss warranty work.

C&I cites cases that hold that, if a contract covers warranty work, a default can be declared after substantial completion.  For example, in *AgGrow Oils v. National Union Fire Insurance Co.*, the court, in interpreting the same AIA A312 bond at issue here, rejected the surety's argument that the issuance of a certificate of substantial completion prohibited bond recovery.  276 F. Supp. 2d at 1016.  The court found that to accept the surety's argument, bonds would be rendered useless in cases where a structure initially appears to be physically sound but is later determined to be deficient.  *Id*.  The court also noted that other courts have found that a surety's obligations do not end even though a substantial completion certificate issues or the owner accepts the project.  *Id*. (citing *Hunters Pointe Partners Ltd. P'ship v. U.S. Fid & Guar. Co.*, 486 N.W.2d 136, 138 (Mich. Ct. App. 1992); *Sch. Bd. of Pinellas Cnty. v. St. Paul Fire & Marine Ins. Co.*, 449 So. 2d 872, 874 (Fla. Ct. App. 1984)).  Moreover, in *Sweetwater*

*Apartments, P.A., LLC v. Ware Construction Services, Inc.*, No. 2:11-CV-155, 2012 WL 3155564, at *5 (M.D. Ala. Aug. 3, 2012), in interpreting an AIA A312 performance bond, the court found that where the surety and subcontractor were jointly and severally liable and the subcontract covered warranty work, the performance bond also covered post-completion warranties. *See also RLI Ins. Co. v. MLK Ave. Redevelopment Corp.*, 925 So. 2d 914, 922-23 (Ala. 2005); *Milwaukee Bd. of Sch. Directors v. BITEC, Inc.*, 321 N.W.2d 127, 131 (Wis. Ct. App. 2009); *Turner Constr., Inc. v. Am. States Ins. Co.*, 579 A.2d 915, 919 (Pa. Super. Ct. 1990); *Sorensen v Robert N. Ewing Gen. Contractor*, 448 P.2d 110, 112 (Ariz. Ct. App. 1968).

The Court finds the cases cited by C&I persuasive for the proposition that where a contract covers warranty work, a default can be declared after substantial completion. To hold otherwise would allow sureties to escape liability, where, as here, though a project is deemed substantially complete, it is subsequently discovered to be deficient. Thus, C&I's declaration of default is sufficient, although it was issued after C&I described the Project as substantially complete.[14]

Fidelity's final argument regarding Paragraph 3.2 is that C&I did not terminate McKnight, relying on the decision in *L&A Contracting*. The Court acknowledges that *L&A Contracting* supports Fidelity's argument that there must be a clear termination of the contractor. *See* 17 F.3d at 111. While there is correspondence in which it is represented that McKnight was terminated, whether and when McKnight was <u>actually</u> terminated,[15] and whether the termination was "clear, direct and unequivocal" raises genuine issues of material fact. Koerber's May 24,

---

[14] No certificate of substantial completion was issued; rather, various dates were provided to Fidelity by C&I, and a certificate of occupancy was issued on February 21, 2003.

[15] The construction contract is incorporated into the Bond. Its Article 8, titled "Termination or Suspension," states that "[t]he Contract may be terminated by the Owner or the Contractor as provided in Article 14 of the General Conditions." The General Conditions are specifically made part of the construction contract but have not been made part of the record in this case.

2004, letter represented to Fidelity that C&I had terminated McKnight's services; and McKnight's counsel's June 1, 2004, letter to Finley asserted that McKnight had been "unilaterally locked out" of the Project. But, as Fidelity points out, Ivester testified in the State Court Action that she never personally terminated McKnight. The date and effect of C&I's filing of a counterclaim against McKnight in the State Court Action should also be considered. *See Mid-State Sur. Corp.*, 575 F. Supp. 2d at 742-43 (filing of civil action against contractor was sufficient to terminate his rights to complete contract). On the issue of termination, the resolution of all such matters should be submitted to the jury.

### c. Paragraph 3.3

Paragraph 3.3 requires the Owner to agree to pay the balance of the contract price to the Surety. Fidelity argues that C&I did not comply with Paragraph 3.3 of the Bond because it did not agree to pay, nor did it pay, the balance of the contract price to Fidelity.[16] C&I argues that it complied with Paragraph 3.3, as the only contract balance withheld by C&I was the retainage amount and it was not due until performance was complete. C&I also argues that the Bond only required it to agree to pay the contract balance, that C&I and Fidelity failed to come to terms on how to handle the withheld retainage in light of the fact that the amount withheld was so much less than the amount needed to complete the Project, and that when C&I prevailed against McKnight in the State Court Action, no balance remained.

On this subject, the record contains the competing affidavits of Finley and Koerber. Finley attests that C&I never agreed to tender the retainage amount. In contrast, Koerber attests that he had been in communications with Fidelity about C&I holding retainage, that the amount

---

[16]The Bond defines balance of the contract price: "The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract."

of retainage was substantially less than the amount necessary to correct the defective and incomplete work, and that C&I would pay or receive a credit for the retainage. There is clearly a disagreement as to whether the retainage amount was actually due and whether C&I agreed to pay the balance.

The cases C&I cites support the contention that if no contract balance remains, the owner is excused from having to comply with Paragraph 3.3. *See Mid-State Sur. Corp.*, 575 F. Supp. 2d at 743 (since it was not possible to comply with paragraph 3.3 of performance bond, Mid-State excused from doing so); *U.S. Fid. & Guar. Co. v. Braspetro Oil Services Co.*, 219 F. Supp. 2d 403, 484 (S.D. N.Y. 2002) (bond owner not required to pay surety when there no remaining contract balance at time default declared), *rev'd on other grounds*, 369 F.3d 34 (2d Cir. 2004). However, neither of these cases discusses how a retainage amount should be handled. All considered, there is a genuine issue of material fact as to whether C&I agreed to pay the retainage, which is all the Bond required.

### d. Reservation of Rights

Fidelity argues that it was acting under a reservation of rights and defenses during all of its dealings with C&I. A reservation of rights, however, can also be waived. *See, e.g., Charles Stores, Inc. v. Aetna Ins. Co.*, 428 F.2d 989, 993 (5th Cir. 1970) (reservation of rights in non-waiver agreement can subsequently be waived). Waiver, in general, may be accomplished by words or conduct. *Canizaro v. Mobile Communications Corp. of Am.*, 655 So. 2d 25, 29 (Miss. 1995). In *Charles Stores*, the Fifth Circuit ruled that an insurer could subsequently waive a reservation of rights contained in a non-waiver agreement, finding that it was not "a free ticket to the insurance company" to do as it wished in its other relations with the insured, "free of responsibility for its actions," and "does not give the insurer a right to do anything it may wish to

prejudice the rights of the insured and thereafter continue to rely on the nonwaiver agreement …." 428 F.2d at 993. Fidelity's reservation of rights similarly did not give it a "free ticket" to do as it wished, including the denial of C&I's claim on a basis not supported by Mississippi law. Fidelity's denial letter referenced only the two-year statute of limitations contained in the Bond, and did not mention at all the Bond's conditions precedent or McKnight's rights and defenses, and included no reservation of rights language. While Fidelity also reserved certain rights in the May 11 letter of its counsel, it had then already denied C&I's bond claim. In view of this, the conditions precedent discussion above and the discussion below regarding the issue of bad faith, whether Fidelity waived its reservation of rights, in whole or in part, as it concerns C&I's compliance with the conditions precedent in the Bond, presents a material issue of genuine fact to be decided by a jury.

### 2. McKnight's Satisfaction of the State Court Judgment

Fidelity argues that it cannot be liable to C&I for any damages paid by McKnight in satisfaction of the judgment in the State Court Action. The Mississippi Supreme Court and the Fifth Circuit Court of Appeals have held that the liability of a surety is predicated on the liability of its principal. *See JSI Communications v. Travelers Cas. & Surety Co. of Am.*, No. 3:13-cv-104, slip op. at 7 (S.D. Miss. Mar. 13, 2014) ("under Mississippi law, it is well settled that the liability of a surety is predicated on the underlying liability of its principal…if the principal has no liability, then liability cannot be imputed on the surety"). *See also Nat'l Sur. Corp. v. U.S.*, 143 F.2d 831, 835 (5th Cir. 1944) ("surety is not liable unless the principal is"); *Fid. & Guar. Ins. Co. v. Blount*, 63 So. 3d 453, 460 (Miss. 2011) ("The surety's liability and obligation are the same as the principal's, and the surety is liable only if the principal is liable"); *State ex rel. Brazeale v. Lewis*, 498 So. 2d 321, 324 (Miss. 1986) (principal had no liability, making surety

free from liability as well); *Irving v. Bankers' Mortg. Co.*, 151 So. 740, 743 (Miss. 1934) ("The liability of the surety is measured by that of its principal"); *Newton Cnty. v. State ex rel. Dukes v. State ex rel. Jordan*, 133 So. 3d 805, 807 (Miss. 2014) ("no liability may be imputed to its surety beyond that of its principal").

Here, McKnight was found liable to C&I, as indicated by the judgment in C&I's favor in the State Court Action. Since McKnight has satisfied the judgment, C&I may not recover that amount again from Fidelity. This does not conclude the analysis, however. During oral argument, C&I clarified that it is not now seeking damages from Fidelity that were paid by McKnight in the State Court Action. Rather, C&I seeks, as actual damages, its attorney's fees from the State Court Action. C&I also seeks its attorney's fees in the instant action as well as punitive damages based on Fidelity's alleged bad faith.[17]

### 3. Attorney's Fees

If the Bond provides for attorney's fees, Fidelity may be liable for them despite McKnight's satisfaction of the state court judgment. Cases cited by C&I support this proposition. *See Chain Elec. Co. v. Nat'l Fire Ins. Co.*, No. 2:03CV368, 2006 WL 2973044, at *5 (S.D. Miss. Oct. 16, 2006) ("'[a] surety's liability is always measured by the express terms of his covenant, which is contained in the obligations of his principal as defined in the main contract and any applicable statute, and in the conditions of the bond'") (citing *Alexander v. Fid.*

---

[17] As discussed below, the Bond contractually authorizes the recovery of attorney's fees. Had McKnight not paid the state court judgment, C&I, if successful in this action, would have been entitled to recover the judgment amount from Fidelity under the Bond since the judgment arose from McKnight's failures to perform the Project's construction contract. The question arises then whether Fidelity may evade liability for punitive damages simply because McKnight satisfied the judgment. An analogous situation was presented in *Kaplan v. Harco National Insurance Co.*, 716 So. 2d 673, 680 (Miss. Ct. App. 1998), where the court evaluated whether "the punitive damages claim could support litigation once the actual damages have been compensated." Answering the question affirmatively, the court held that the punitive damages claim was not terminated by the insurer's payment of the actual damages sought after suit against the insurer for actual and punitive damages was filed. Similarly, Fidelity here cannot avoid exposure to punitive damages merely because McKnight satisfied the judgment if its conduct would otherwise subject it to the potential of a punitive damages award.

& *Cas. Co.*, 100 So. 2d 347, 349 (Miss. 1958)); *Stowell v. Clark*, 118 So. 370, 372 (Miss. 1928) (subcontractor had right to sue on bond "to the benefits and conditions of the bond," and as bond provided for attorney's fees, to charge their attorney's fees against bond). Fidelity argues though that it is not liable to C&I for attorney's fees stemming from the State Court Action because it was not a party to the contract between McKnight and C&I and attorney's fees can only be awarded in Mississippi when provided for by statute or contract, citing *Asbury MS Gray-Daniels, L.L.C. v. Daniels*, 812 F. Supp. 2d 771, 784 (S.D. Miss. 2011). Fidelity also argues that since C&I did not comply with the Bond's conditions precedent, Fidelity cannot be liable to C&I for attorney's fees associated with the instant action. At oral argument, Fidelity nonetheless stated that Paragraph 6.2 of the Bond would obligate Fidelity to pay C&I's attorney's fees, as "legal costs," if the requisites of the Bond were met.

C&I, on the other hand, argues that it should be awarded its attorney's fees from both the instant action and the State Court Action. It contends that Paragraph 6.2 of the Bond was triggered because C&I complied with the Bond's conditions precedent. Moreover, according to C&I, a plain reading of Paragraph 6.2 permits it to recover attorney's fees and expenses both from the instant action and the legal proceedings against McKnight. Alternatively, C&I argues that Paragraph 6 is ambiguous and must be construed in its favor.[18]

It does not appear that any Mississippi cases have discussed Paragraph 6 of an AIA A312 performance bond, much less Paragraph 6.2. A plain reading of Paragraph 6 though

---

[18] C&I argues that the first sentence of Paragraph 6, which begins "[a]fter the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Subparagraph 4.1, 4.2, and 4.3 above" only applies in the event that Fidelity acts on C&I's claim, and has no bearing here where Fidelity has denied C&I's claim. C&I thus argues that the first sentence likely belongs in a different paragraph and does not impose conditions on Fidelity's liability for attorney's fees. C&I contends that the rightful reading of Paragraph 6 would change the "and" to "or," and would then subject Fidelity to legal costs "resulting from the Contractor's Default, *or* those resulting from the actions or failure to act of the Surety under Paragraph 4." C&I argues such is consistent with the purpose of the Bond to ensure compensation for all consequential losses in the event of the contractor's default, even where the surety acts on the obligee's claim.

unambiguously indicates that the Bond allows attorney's fees under Paragraph 6.2 only if Fidelity acts in accordance with Paragraphs 4.1, 4.2, or 4.3,[19] which Fidelity did not do. For this reason, the Court finds that Paragraph 6.2, given Fidelity's denial of the claim, does not address the instant attorney's fees question. *See Hankins v. Md. Cas. Co./Zurich Am. Ins. Co.*, 101 So. 3d 645, 653 (Miss. 2012) ("If a contract is clear and unambiguous, then it must be interpreted as written"; ambiguities do not exist "simply because two parties disagree over the interpretation of a policy."); *Blount*, 63 So. 3d at 461 ("Courts are bound to enforce contract language as written and give it its plain and ordinary meaning if it is clear and unambiguous.").

Although the parties focus their arguments on Paragraph 6.2, the Court finds that Paragraph 5, on which neither party relies, can serve as a basis for C&I's recovery of attorney's fees, assuming C&I can show it either complied with all of Paragraph 3's conditions precedent or that Fidelity waived them. Paragraph 5 provides that if Fidelity proceeds in accordance with Paragraph 4.4—specifically, if Fidelity waives its right to perform and denies liability, in whole or part, and notifies C&I of the reasons for such denial—C&I "shall be entitled to enforce any remedy available to [it]." While it seems there are no cases interpreting or applying this particular provision of the A312 bond, "any remedy" broadly implies no restriction on the amount, type or nature of damages a bond obligee may seek. Thus, assuming C&I can prove the damages it seeks as attorney's fees were caused by a breach of the Bond by Fidelity, Paragraph 5 may entitle C&I to its attorney's fees from both the State Court Action and the instant action. Additionally, if C&I succeeds on its bad faith claim and is awarded punitive damages, it may also be entitled to an award of attorney's fees. *See Fulton v. Miss. Farm Bureau Cas. Ins. Co.*, 105 So. 3d 284, 287 (Miss. 2012) ("[a] judge may award attorney's fees collaterally only if

---

[19] Paragraphs 4.1, 4.2 and 4.3 provide for the Surety to, respectively, arrange for the Contractor to complete the construction contract, undertake completion of the construction contract itself, or arrange for another contractor to complete the construction contract. Fidelity did none of these things.

statutorily authorized, or if punitive damages are also awarded."). Because C&I's eligibility for attorney's fees is tied to the reconciliation of underlying factual issues, summary judgment on the issue of attorney's fees would be inappropriate.

### B. Bad Faith

#### 1. Duty of Good Faith and Fair Dealing

Fidelity contends that it is entitled to summary judgment on C&I's bad faith claim because a surety does not owe a duty of good faith and fair dealing to its obligee. Pointing out that the United States Supreme Court has held that suretyship is not insurance, Fidelity argues that the few cases in Mississippi discussing bad faith as it relates to a construction bond surety treat the surety, without discussion, as an insurance company and apply the insurance bad faith standard. According to Fidelity, since the Mississippi cases that have dealt with the issue of a surety and bad faith have applied the insurance standard without discussion, the Court should instead follow the decision by the Supreme Court of Texas in *Great American Insurance Co. of America v. North Austin Municipal Utility District No. 1*, 908 S.W.2d 415, 420 (Tex. 1995), which held that that a surety cannot be liable for bad faith based on a number of policy considerations.

In response, C&I argues that the *Great American* decision is neither controlling nor persuasive in the instant case. Citing *Sentinel Industrial Contracting Corp. v. Kimmins Industrial Service Corp.* and *McQueen Contracting, Inc. v. Fidelity & Deposit Co. of Maryland*, C&I argues that the Mississippi Supreme Court and the Fifth Circuit have held that bad faith claims may be made against a construction bond surety, and that bad faith claims against a construction bond surety are treated exactly the same as those against an insurance company.

C&I also argues that Fidelity's contention that it is not liable for punitive damages is an incorrect statement of the law in the context of a bad faith claim.

The Court agrees with C&I. In *Sentinel,* the Mississippi Supreme Court made no distinction between suretyship and insurance for purposes of a bad faith claim, and discussed the insurance bad faith standard as it applied to a suretyship dispute. 743 So. 2d 954, 972 (Miss. 1999). In *McQueen,* the Fifth Circuit also made no distinction between an insurer and surety for purposes of a bad faith claim. 871 F.2d 32, 34 (5th Cir. 1989).

Thus, under Mississippi law, as recognized in *Sentinel* and *McQueen*, in appropriate cases, a surety may be liable for punitive damages and for bad faith. Such has also been recently recognized in the March 13, 2014, opinion in *JSI Communications*, No. 3:13-cv-104, slip op. at 9, which also discussed the bad faith standard as it applies to construction bond sureties. Although Fidelity urges this Court to ignore such law in Mississippi and the Fifth Circuit treating an insurer and a surety the same for purposes of bad faith claims, the Court declines to do so. The Court finds that, under Mississippi law, Fidelity owes C&I a duty of good faith and fair dealing and may be held liable for its breach.

### 2. *Breach of Duty - Bad Faith*

Whether Fidelity is liable for bad faith as a result of breaching its duty of good faith and fair dealing must next be examined. A bad faith claim is essentially a claim for punitive damages. *See, e.g.*, *McQueen*, 871 F.2d at 34. "'Mississippi law does not favor punitive damages; they are considered an extraordinary remedy and are allowed with caution and within narrow limits.'" *Warren v. Derivaux*, 996 So. 2d 729, 738 (Miss. 2008) (quoting *Life & Cas. Ins. Co. of Tenn. v. Bristow*, 529 So. 2d 620, 622 (Miss. 1998)). In the context of a bad faith

claim against an insurer or a surety, punitive damages are awarded based on the following standard:

> Once coverage is established, the issue of punitive damages should be submitted to the jury if the trial court determines that there are jury issues with regard to whether: (1) the insurer lacked an arguable basis for denying the claims, and (2) the insurer committed a willful or malicious wrong, or acted with gross and reckless disregard for the insured's rights.

*Sobley v. S. Natural Gas Co.*, 210 F.3d 561, 564 (5th Cir. 2000) (citing *State Farm Mut. Auto. Ins. Co. v. Grimes*, 722 So. 2d 637, 641 (Miss. 1998)). *See also McQueen*, 871 F.2d at 34.

The Court must first determine which "reason" for denial given by Fidelity is relevant for purposes of C&I's bad faith claim and the arguable basis denial analysis. Fidelity argues that it was entitled to rely on McKnight's rights and defenses, and given the legitimate dispute between McKnight and C&I, it had an arguable basis for denying C&I's claim. C&I argues that, for purposes of bad faith, Fidelity is bound by the reason it gave to C&I in its denial letter and cannot now, at the point of litigation, raise new reasons for denial. The Court agrees with C&I.

In *Eichenseer v. Reserve Life Insurance Co.*, in discussing bad faith insurance claims, the court found that "[a] court must look to the reason an insurance company gives to an insured for denying the claim; the issue is not the defense which the insurer settles on at trial to defend the suit." 682 F. Supp. 1355, 1372 (N.D. Miss. 1988), *aff'd*, 881 F.2d 1355 (5th Cir. 1989), *vacated on other grounds*, 499 U.S. 914 (1991). The court noted "an insurer may be subject to punitive damages for initially denying a claim without an arguable reason, even if it later decides to pay." *Id*. In *Sobley v. Southern Natural Gas Co.*, the Fifth Circuit held that:

> Under Mississippi law, an insurer may rely on any exclusion in the policy to show that no coverage existed, whether or not that exclusion was the stated basis for denial. However, once coverage is established, a court should evaluate whether there was an arguable basis for denial of coverage based solely on the reasons for denial of coverage given to the insured by the insurance company.

210 F.3d at 564 (5th Cir. 2000). The court found that the trial judge erred in considering justifications for denial of coverage other than those contained in the insurer's denial letter. *Id.* *See also Bankers Life and Cas. Co. v. Crenshaw*, 483 So. 2d 254, 271-73 (Miss. 1985) (insurance company subjected itself to punitive damages by consistently asserting, up until actual trial, reason for denial that constituted no arguable defense under Mississippi law; not until trial began did insurer assert another reason for denying claim).

Moreover, in *JSI Communications*, a case involving a surety, the surety denied the obligee's claim and, <u>in its denial letter</u>, stated that one of the reasons it was denying the claim was that its principal had been released from liability. No. 3:13-cv-104, slip op. at 9. The court found that the surety "clearly had a reasonable basis for denying the claim." *Id.* at 9. Thus, unlike here, there was no genuine issue of material fact as to whether the surety acted in bad faith. *Id.* (citing *S. United Life Ins. Co. v. Caves*, 481 So. 2d 764, 769 (Miss. 1985)).

From a reading of these cases, it seems clear that once coverage has been established, the surety or insurer is bound by the reason it gives for denial for purposes of a bad faith claim. Here then, if the conditions precedent are found to have been met, or not waived, Fidelity is bound by the reason it gave in its March 3, 2005, denial letter, namely, the Bond's two-year statute of limitations. To hold otherwise would allow sureties to deny their obligee's claims based on reasons not founded in fact or law and later, in litigation, argue that they instead had another legitimate reason for denial.

Given the authorities above, the Court finds that a genuine issue of material fact exists as to whether Fidelity had an arguable basis for denying C&I's claim based on the reason given in its March 3, 2005, denial letter. As C&I argues, Fidelity's denial was based on its assertion of a two-year statute of limitations under Paragraph 9 of the Bond that was not recognized under

Mississippi law.[20]  Based on Finley's deposition, Fidelity seems to have relied solely on McKnight's counsel's suggestion that C&I could no longer bring a claim on the Bond under Mississippi law in reaching its decision to deny C&I's claim.[21]  The Court notes that Fidelity conceded by the time of its first summary judgment motion that the two-year statute of limitations did not apply.  But in its denial letter to C&I, Fidelity neither stated nor implied any other basis for denial.

Fidelity was presumably on notice of other potential bases to deny the claim, including the fact that C&I was withholding the retainage amount, since they were mentioned in McKnight's counsel's June 1, 2004 letter.  However, Fidelity only referenced the statute of limitations as grounds for denial.  Although Fidelity argues that the legitimate dispute between McKnight and C&I demonstrates that it had an arguable basis to deny the claim, Fidelity did not give that as an excuse to deny the claim, and denied the claim well before such dispute was adjudicated.

Further, Fidelity at no point before the instant litigation amended or modified its basis for denying C&I's bond claim to include Paragraph 3 of the Bond.  Fidelity appears to have not even mentioned any other provision of the Bond until May 11, 2005, only _after_ it received the letter from C&I's counsel demanding that Fidelity preserve and not destroy over three pages of certain types of evidence.  Although the May 11 letter also purported to reserve Fidelity's rights, denial of C&I's claim had already been made.  And, while the May 11 letter mentions Paragraph 3.3 of

---

[20] Paragraph 9 of the Bond provides: "Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor default or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first.  If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable."

[21] Finley testified that McKnight's counsel was the first to raise the statute of limitations issue before Fidelity denied the claim.  McKnight's counsel suggested that Fidelity could deny the claim based on the contractual limitations period in the Bond, and that such would be enforceable under Mississippi law.

the Bond, it does not state that Paragraph 3.3 was ever the basis of its denial of C&I's claim. Finally, Fidelity's contention at oral argument that its May 11 letter "reopened" the bond claim is not convincing where, among other things, no decision on any such "reopened claim" was ever made by Fidelity.

Thus, whether Fidelity had an arguable basis to deny the claim and whether such denial and other conduct amount to bad faith sufficient to demonstrate that it acted with gross and reckless disregard for C&I's rights, or committed a willful or malicious wrong, *see Sobley*, 210 F.3d at 564, are issues most properly reserved for trial. Summary judgment on C&I's bad faith claim therefore should be denied.

**IV**
**Conclusion**

For the reasons above, the Court finds that Fidelity's motion for summary judgment [86] should be denied.

SO ORDERED, this 22nd day of July, 2014.

**/s/ Debra M. Brown**
**UNITED STATES DISTRICT JUDGE**